[Civ. No. 14841. Third Dist. Mar. 16, 1976.]

GENE D. WONG et al., Plaintiffs and Appellants, v.
BENEFICIAL SAVINGS AND LOAN ASSOCIATION et al.,
Defendants and Respondents.

## COUNSEL

Seymour Berger, Brennan, Harrison & Yun and James A. Brennan for Plaintiffs and Appellants.

Angell, Adams & Holmes and J. Kenny Lewis for Defendants and Respondents.

## OPINION

**PARAS, J.**—This case involves the so-called "dragnet" or "other indebtedness" clause sometimes used in deeds of trust and other security agreements. Plaintiffs (Mr. and Mrs. Wong) appeal from a judgment after the trial court found defendants not liable for damages for their alleged wrongful refusal to accept plaintiffs' tender of an amount sufficient to redeem four out of eight concurrently executed deeds of trust.

In 1963, Mrs. Margaret Roerden constructed eight four-plex apartment buildings on land she owned in Rancho Cordova, a suburb of Sacramento. Financing was provided by Beneficial Savings and Loan Association which later merged into Fidelity Savings and Loan Association (both hereinafter referred to as "defendant"). For the purpose of taking advantage of the 80 percent loan limitation of Financial Code section 7153, rather than to be restricted to the 70 percent limitation of section 7152,[1] the property was subdivided into eight parcels.

---

[1]Although they have since been amended, in 1963 the Financial Code sections read as follows:

"§ 7152.

"An association may make amortized loans upon the security of improved real

Mrs. Roerden executed eight promissory notes secured by eight separate deeds of trust covering the eight individual parcels. Each deed of trust contained a "dragnet" clause. Each note was for an identical $28,000, despite the fact that the value of the improvements varied. The apartment complex's swimming pool was located on one parcel, and its parking lot was located on two others. Four of the eight parcels fronted on the adjacent public street. The legal descriptions included grants or reservations of nonexclusive easements for ingress and egress to and from the rear parcels, but there was no express easement regarding access to or use of the common parking lot and swimming pool.

On or about November 17, 1964, Mrs. Roerden sold the property to a partnership consisting of plaintiff Gene Wong, George Takehara and William Ausseresses (and their respective spouses) for $266,734.44. The partners assumed the eight loans and deeds of trust in the then aggregate sum of $221,356.32, as well as a Wells Fargo Bank furniture loan of $18,056.56.

Mr. Ausseresses negotiated the purchase and loan assumption for the partners. Plaintiffs did not directly participate. Mr. Ausseresses also handled payments on the property for the partners after the purchase. Financial problems were encountered, and in June 1965, the other partners transferred their interests to Mr. and Mrs. Wong.

On July 1, 1965, plaintiffs received eight notices of default and elections to sell under the deeds of trust. At approximately the same time, defendant took possession of the apartments and began collecting the rents under the assignment of rents provision of the deeds of trust. Discussions about curing the default were unproductive; and on October 11, 1965, defendant published seven notices of trustee's sale set for November 16, 1965, and an eighth notice of trustee's sale (for parcel No. 8) set for November 29, 1965. No tender of the arrearages was made before the expiration of the 90 days provided in Civil Code section

---

property in an amount not in excess of 70 percent of the appraised value of such real property.

"§ 7153.

. "An association may make amortized loans upon the security of residential real property, the principal improvements on which consist of a dwelling or dwellings for not more than four families . . . in an amount not in excess of 80 percent of the appraised value of such real property if the appraised value does not exceed forty thousand dollars ($40,000), or not in excess of 80 percent of the first forty thousand dollars ($40,000) of such appraised value if it exceeds forty thousand dollars ($40,000) plus 70 percent of the remainder of such appraised value."

2924c. However, on November 11, 1965, plaintiff Mr. Wong and his counsel appeared at defendant's office and tendered three certified checks, each in the sum of $30,000, to pay the entire indebtedness on three of the front parcels. This tender was refused on the ground that the eight parcels constituted a single unit. The tender and refusal were repeated at defendant's counsel's office in San Francisco.

One of the attorneys for defendant who was present at the meeting at which the tender took place testified as follows: "As I recall, Mr. Cofod, Mr. Angell or myself, stated that we weren't in a position to accept reinstatement at that time, but we had no authority from our client to do so, that the three months statutory period had expired and that he had no right to reinstate as a matter of law, and there was some discussion also about the three front lots and the fact that they contained or two of them contained the parking lots that were used by all the lots in the complex and that one of the front lots also contained a swimming pool, which was used by all the tenants in all eight buildings and that we weren't authorized to accept a reinstatement of part of them or less than all eight lots."

On November 15, 1965, plaintiffs filed suit to enjoin the sale of the three parcels for which they had tendered payment, and obtained an ex parte temporary restraining order. The trustee's sale of the other four parcels was not held and defendant stipulated to an indefinite continuation of the restraining order. On November 23, 1965, plaintiffs tendered an additional $30,000 certified check to redeem parcel No. 8 (the last front parcel), which tendered was refused. The noticed sale of parcel No. 8 also did not take place.

During the course of subsequent negotiations, plaintiffs rejected an offer of defendant to consolidate the eight loans and deeds of trust into a single loan and deed of trust upon payment of $13,598.29; they also rejected an offer by defendant to accept plaintiffs' tender for the four front parcels upon condition that plaintiffs give defendant an easement for use of the parking lot and swimming pool by tenants of the four rear parcels.

Meanwhile, plaintiffs defaulted on the furniture loan with Wells Fargo, and Wells Fargo obtained a judgment against them.

On May 22, 1969, the injunction suit was dismissed without prejudice; the present suit was filed on October 16, 1967 (or Dec. 12, 1967,

according to defendant).[2] On July 1, 1969, a trustee's sale was conducted, and the eight parcels were all sold to defendant. Plaintiffs were not specifically notified of this sale. On December 31, 1969, defendant sold the property to a third person for the sum of $270,000, and recorded a single deed of trust covering the eight parcels. On April 23, 1970, plaintiffs filed their third amended complaint in this action, seeking (1) damages for defendant's wrongful refusal of the tender on the first three parcels, which allegedly deprived the plaintiffs of their right of redemption under Civil Code section 2903; (2) identical damages as to the fourth parcel; (3) an accounting of rents and expenses on the four parcels from the time defendant began collecting rents; and (4) damages for defendant's failure to notify plaintiffs of the trustee's sale, including damages for conversion of the furniture.

The case came to trial on February 10, 1971. Inter alia, plaintiffs testified that when they assumed the loans, they were unaware of the dragnet clause in the deeds of trust. The Sacramento County Planning Director testified that the rear lots, if treated separately, would violate zoning ordinances requiring minimum lot width, street frontage, and off-street parking facilities.

On March 31, 1971, the court filed its memorandum of intended decision, ruling that plaintiffs had no right to redeem the four parcels because of the dragnet clause, that plaintiffs had no right to notice of the trustee's sales, and that plaintiffs had failed to prove any damages from the alleged conversion. But the court did rule that plaintiffs had a right to an accounting. The court appointed a Sacramento attorney, Eugene Anderson, as a special referee under Code of Civil Procedure section 639, to make proposed findings regarding the accounting.

On February 22, 1974, plaintiffs settled the accounting cause of action for $17,280. Judgment for defendant was entered on April 10, 1974, as to the remaining causes of action.

I

Plaintiffs' major contention on appeal is that the dragnet clause in the deeds of trust should not have been enforced against them so as to prevent the division of the apartment complex. The clause in question states that the deed of trust is:

---

[2]We cannot readily confirm the correct date, because the clerk's transcript begins with the third amended complaint filed April 23, 1970.

"FOR THE PURPOSE OF SECURING: (1) Payment of the sum of $28,000.00 with interest thereon according to the terms of a promissory note or notes of even date herewith, made by Trustor, payable to the order of the Beneficiary, and extensions or renewals thereof; (2) payment of such additional amounts as may be hereafter loaned by Beneficiary or its successor to the Trustor or any of them, or any successor in interest of the Trustor, with interest thereon, *and any other indebtedness or obligation of the Trustor, or any of them, and any present or future demands of any kind or nature which the Beneficiary or its successor may have against the Trustor, or any of them, whether created directly, or acquired by assignment, whether absolute or contingent, whether due or not, whether otherwise secured or not, or whether existing at the time of the execution of this instrument, or arising thereafter;* (3) performance of each agreement of Trustor herein contained; and (4) payment of all sums to be made by Trustor pursuant to the terms hereof." (Italics in original.)

The literal effect of this clause is to make each deed of trust security for all eight loans (and conversely, to secure each loan with all· eight deeds of trust). Clauses such as this are often termed "dragnet" or "anaconda," "as by their broad and general terms . they enwrap the . unsuspecting debtor in the folds of indebtedness embraced and secured in the mortgage *which he did not contemplate . . . ,*" (Italics added.) (*Berger* v. *Fuller* (1929) 180 Ark. 372, 377 [21 S.W.2d 419, 421]; see *Capocasa* v. *First Nat. Bank* (1967) 36 Wis.2d 714, 722 [154 N.W.2d 271, 275].)

California Real Estate Secured Transactions (Cont. Ed. Bar 1970) page 135, in a chapter by Roger H. Bernhardt, contains a comprehensive discussion of future advance and dragnet clauses at sections 4.18-4.30. We quote portions thereof: "The literal meaning of this clause extends the deed of trust to cover every past and present obligation between the debtor and the creditor. The clause purports to say that a bank holding a deed of trust on a borrower's property to secure his real estate loan from it may turn to that deed of trust any time he falls behind on a personal loan from it, misses a payment on his automobile loan from it, or overdraws his checking account at the bank. . . . It also appears to mean that any other creditor of the debtor can sell his obligation to the bank, which can then tack that debt to its deed of trust. . . . (At § 4.18, p. 152.)

". . . . . . . . . . . . . . . . . .

"*California courts have rather consistently tended to prefer a construction that is more faithful to the parties' actual expectations than to the literal wording of the clause.* As early as 1889 the California Supreme Court held that such a clause did not permit the creditor to buy up an obligation owed by the debtor to a third party and put it under his own mortgage. Moran v Gardemeyer (1889) 82 C 96, 23 P 6. The case in fact goes even further than the above rule announced by the court, since it was a situation in which the debtor obtained a second loan from his secured creditor by endorsing over a note he (the debtor) was holding from a third party; it was this note that the Supreme Court held to be unsecured. The court of appeal announced the same rule 16 years later in Provident Mut. Bldg. & Loan Ass'n v Shaffer (1905) 2 CA 216, 83 P 274, again in a situation more favorable to the creditor than the rule made it appear. In Provident the secured creditor later advanced $300 above the original loan to pay a materialman for goods supplied to benefit the real property secured by the mortgage, but still was not allowed to add the $300 to his mortgage.

"[The result in these cases] was based far more on the perceived inequity of permitting a creditor to subject his debtor to such claims than on any inadequacies in the fine print.

"Even when a secondary obligation is one that was originally created solely between the debtor and his creditor, it may not necessarily come under the dragnet clause. In Moran v Gardemeyer (1889) 82 C 102, 23 P 8 (a companion case to the other Moran), a note recited that it was secured by a crop mortgage and did not refer to the existing real estate mortgage under which the creditor desired to secure this note. The Supreme Court held that if the note had said nothing about security, it could have come under the real estate mortgage, but because it expressly referred to other security, it was not secured by the real estate mortgage." (Italics added.) (At § 4.22, p. 157.)

"In many states a rule exists that other obligations of a debtor to his creditor that either already exist or are created simultaneously with a primary debt and the security instrument are not secured unless they are explicitly described in the security instrument. See, e.g., National Bank v Blankenship (1959) 177 F Supp 667, aff'd sub nom National Bank v General Mills (1960) 283 F2d 574. Some states hold that because it is so easy to describe those other debts, failure to enumerate them is strong evidence of an intent that they not be covered by the security. See First v Byrne (1947) 238 Iowa 712, 28 NW2d 509; Farmer's Nat'l Bank v De

Fever (1936) 177 Okla 561, 61 P2d 245; Sowder v Lawrence (1929) 129 Kans 135, 281 P 921; Iser v Marks Bldg. Corp. (1930) 253 NY 499, 171 NE 757." (At § 4.21, p. 155.)

Professor Bernhardt suggests that "the burden should be on the proponent to show that both parties intended the other loan to be included." (*Ibid.*) This we deem to be the law in California. It is supported by the two most recent cases dealing with dragnet clauses, *Gates* v. *Crocker-Anglo Nat. Bk.* (1968) 257 Cal.App.2d 857 [65 Cal.Rptr. 536], and *Lomanto* v. *Bank of America* (1972) 22 Cal.App.3d 663 [99 Cal.Rptr. 442]. In *Gates,* Abell and Gates executed a $60,000 note secured by a deed of trust on real property which they owned as tenants in common. The deed of trust contained a dragnet clause. Unknown to Gates, Abell at that time owed the bank $20,500 for an unsecured loan, which was then in default. The bank sought to satisfy the $20,500 obligation out of the proceeds of sale of the property. Citing general equitable principles, the court held that the dragnet clause was not enforceable against the unaware cotenant's interest in the property. The case stands for the proposition that such a clause will be enforced against the proprietary interest of a party who was aware of the clause and appreciated its significance, but not against the interest of a party without such awareness.

*Lomanto* also involved two signers of the original note and deed of trust, this time husband and wife. Mr. and Mrs. Lomanto signed an $11,600 note on August 26, 1965, secured by a deed of trust acknowledged August 31, 1965, which contained a dragnet clause. A year and a half later, Mr. Lomanto alone obtained two additional unsecured loans in the amounts of $11,500 and $5,500 respectively. Upon default on all three loans in 1970, the bank asserted that all three were secured by the encumbered property under the dragnet clause. The Lomantos sued, and the bank's demurrer was sustained without leave to amend. The Court of Appeal stated in regard to Mr. Lomanto, despite his allegation of lack of knowledge, "He would find it difficult to explain why he would think Bank would lend him $11,500 on his unsecured note of hand in 1967 and an additional $5,500 in the same manner, when in 1965 Bank required security for a loan of $11,500, which was still unpaid. If he alone were involved, we should have no hesitation in holding there was no abuse of discretion in sustaining the demurrer without leave to amend." (22 Cal.App.3d at p. 668.)

The court then reversed as to Mrs. Lomanto, holding that as an assumed co-owner, she should be allowed to amend her pleading to show lack of awareness of the clause. Implicit in the court's holding is the necessity that the unawareness be a *reasonable* unawareness. (See the brief discussion of *Lomanto* in McCall, *Due Process and Consumer Protection: Concepts and Realities in Procedure and Substance—Repossession and Adhesion Contract Issues* (1974) 26 Hastings L.J. 383, 418-419, fn. 162, and Leipziger, *Deficiency Judgments in California: The Supreme Court Tries Again* (1975) 22 U.C.L.A. L.Rev. 753, 814, fn. 169.)

In determining the intention, or rather the *reasonable* intention of the parties, at least two significant considerations are apparent in the cases in this and other jurisdictions: (1) the relationship of the loans, and (2) the reliance on the security. We quote again from the excellent discussion of Professor Bernhardt:

"(1)  [4.23] Relationship of Loans

"The two Moran cases discussed [above] illustrate a pair of considerations that have been dignified in other states into important determinants of whether a later loan by the same creditor will be protected by the original security. In Moran v Gardemeyer (1889) 82 C 96, 23 P 6, where the debt was one bought up from a third party, the rationale there appears elsewhere in the form of a test concerning the relationship of the two loans to each other. If the first loan is made to enable the borrower to erect improvements on his real estate and the purpose of the second loan is only to finance more improvements on the same real estate, it is not hard to tie the two loans together under one deed of trust. But in a case such as Moran, there is so little connection between the loans that a court may easily find that the parties did not intend (either when executing the security instrument or when making the second loan) that the second loan should fall under the security. Thus Alabama has refused to let creditors sweep negligence or rent claims under their mortgages. Monroe County Bank v Qualls (1929) 220 Ala 499, 125 S 615; Albertville Trading Co. v Crichter (1927) 216 Ala 252, 112 S 907. See also McCollum v Braddock Trust Co. (1938) 330 Pa 293, 198 A 803. The rationale here is basically one of ejusdem generis: The phrase 'all other debts' means all other debts similar to the primary debt. See Beavers v Le Sueur (1939) 188 Ga 393, 3 SE2d 667." (At § 4.23, pp. 157-158.)

"Under such a test, items like overdraws on a checking account . . . are so different in nature that they should not be included within the security unless the parties specifically describe them." (*Ibid.*)

"(2)  [4.24] Reliance on the Security

"Moran v Gardemeyer (1889) 82 C 96, 23 P 6, illustrates another kind of test. There the second loan was held not secured by the real estate mortgage because the promissory note recited that it was secured by a crop mortgage. In other words, the creditor could not claim to have relied on his (real estate) security in making the loan. One rationale for this is that the dragnet clause constitutes a continuing offer by the borrower to secure further loans under the security, and in order to determine whether the lender accepts the offer when a second loan is made, his intent must be ascertained, and there can be no such intent when he takes different security instead. See Second Nat'l Bank v Boyle (1951) 155 Ohio St 491, 99 NE2d 474. If this holds true in California, an automobile loan (with the vehicle as security) should not come under a deed of trust held by the same bank. Even a personal loan from the bank, although obviously not separately secured, may be disqualified if examination of the bank's records and books shows that the bank was not relying on its deed of trust when it made the loan. Cf. Hollywood State Bank v Cook (1950) 99 CA2d 338, 221 P2d 988; Langerman v. Puritan Dining Room Co. (1913) 21 CA 637, 132 P 617." (§ 4.24, pp. 159-160.)

■ We now apply the foregoing principles to this case. First, the plaintiff debtors testified without contradiction that they were unaware of the dragnet provision. In fact, they did not sign the original notes and deeds of trust which they later assumed. However, they physically walked through the complex before they purchased it; they cannot have been misled as to its "singleness" which from the record before us was unmistakable. In fact, they themselves purchased it as a single unit in one transaction.

It may be technically argued that the second of the two aforecited considerations bearing on the question of intent militates against upholding the dragnet clause here, because there was no expressed reliance on any other security; each note says that it is secured by "a" deed of trust, not eight deeds of trust. However the fact that in actuality there was a single transaction, that it was split into eight units in order to obtain a more favorable loan, and that the back lots would lose their

value if the parking facilities and swimming pool were unavailable to them, all strongly suggest that true reliance was present, despite the technical language.

Furthermore, the first consideration, the relationship among the loans, undeniably indicates, and indeed compels, a contrary result. Despite the separation of the property into eight parcels for financing purposes, we again note that the eight units comprising the apartment complex constituted an indivisible whole. The individual parcels are not separable either for zoning purposes or in terms of use or market value. Zoning laws would have prohibited construction of some. of the units if attempted to be erected alone; and the utility as well as the market value of each unit depends upon access to the common facilities (the swimming pool and parking lot) and also upon the ability to control the rest of the complex (to keep congenial tenants, for proper maintenance, etc.).

Finally, since relief from the effect of dragnet clauses involves principles of equity, we note the lack of bona fides on the part of plaintiffs. They were offered the four front lots if they would give an easement to the parking lot and swimming pool for the benefit of the rear lots. Knowing the devastating effect the absence of such an easement would have upon the rear lots, they refused. Their ignoble scheme made them unworthy of equity's favor.

Under these circumstances, we hold that the dragnet clause was properly held enforceable, and plaintiffs were not entitled to redeem any one parcel without redeeming them all.

## II

Plaintiffs also contend that the court erred in failing to award damages for defendant's alleged conversion of the furniture. In its notice of intended decision, the court refused to award damages because plaintiffs failed to establish them.

Plaintiffs suggest in their brief that the value of the furniture could be determined from (1) the obligation owed to the bank (2) depreciation guidelines published by the Internal Revenue Service or (3) the amount of the money judgment on the furniture contract. All of the suggested measures, however, relate to the *obligation,* and not the *furniture,* and hence are irrelevant. Plaintiffs point to nothing in the record which shows the value of the furniture itself.

Moreover, plaintiffs never made a specific demand for the furniture; rather their concern was with defendant's failure to pay on the furniture loan out of the rents that were being collected. Indeed, as long as plaintiffs hoped to redeem some or all of the property, they had an interest in allowing the furniture to remain in the apartments in order to keep them rented. Given this interest, we cannot say that plaintiffs' demand for the real property was a separate demand for the furniture to be removed from the apartments. The trial court correctly denied plaintiffs relief on this claim.

The judgment is affirmed.

Puglia, P. J., and Friedman, J., concurred.