James LUNDGREN, Appellant,

v.

NATIONAL BANK OF
ALASKA, Appellee.

Henry F. MOGG, Appellant,

v.

NATIONAL BANK OF
ALASKA, Appellee.

Nos. S–784, S–1150, S–933 and S–1161.

Supreme Court of Alaska.

Sept. 11, 1987.

Rehearing Granted in Part and Opinion
Amended Dec. 9, 1987.[*]

---

[*] Editor's Note: This opinion was originally published at 742 P.2d 227. It is published here as corrected.

Woody Brooks, Aschenbrenner & Brooks, Fairbanks, for appellant Lundgren.

Kenneth P. Jacobus, Hughes, Thorsness, Gantz, Powell & Brundin, Anchorage, for appellant Mogg.

Barbara L. Schuhmann and Howard Staley, Schaible, Staley, DeLisio & Cook, Fairbanks, for appellee Nat. Bank of Alaska.

Michael F. Crotty, Associate Gen. Counsel for American Bankers Ass'n, Washington, D.C.

Barbara L. Schuhmann, for amicus curiae, American Bankers Ass'n.

Before RABINOWITZ, C.J., and BURKE, MATTHEWS, COMPTON and MOORE, JJ.

## OPINION

RABINOWITZ, Chief Justice.

### I. BACKGROUND.

These consolidated appeals arise from a judicial foreclosure suit instituted by appellee, National Bank of Alaska (NBA) against two debtor corporations, J. McCall, Inc. (JMI) and Lundgren Pacific Construction Company (LPCC), both owned by John R. McCall. The corporations had guaranteed each other's debt to NBA, the total of which was over $2 million. NBA sought to foreclose on several pieces of property owned by JMI or LPCC on which NBA held deeds of trust. The suit also named, among other defendants, James Lundgren and Henry F. Mogg, each of whom held a later deed of trust on different pieces of property as to which NBA was seeking to foreclose.

The main issue presented in these appeals from the superior court's grants of summary judgment is the effect of "dragnet clauses," contained in two of the deeds of trust held by NBA, which purport to secure payment of all past, present and future indebtedness of the debtor to the creditor. NBA asked that its security interest in the properties be declared superior to Lundgren's and Mogg's as to the entire amount owed NBA, by virtue of the dragnet clauses.

### A. Seven Mile North Yard (Lundgren Appeal).

In 1978, NBA made a series of loans to JMI and LPCC to enable those corporations to purchase and resell surplus Alyeska Pipeline equipment. On July 28, 1978, these loans were consolidated into two collateral notes, with Lundgren executing one for $1,506,635.21 in his capacity as president of LPCC and McCall executing the other, for $1,182,536, as president of JMI. Both notes were secured by "[a]ll equipment now owned and hereafter acquired". JMI and LPCC had previously guaranteed each other's debt to NBA.

On August 9, 1978, NBA loaned JMI $90,000. This loan was secured by a second deed of trust on a piece of real property in Fairbanks referred to as "Seven Mile North Yard." Alaska National Bank (ANB) held a first deed of trust on the property which secured a principal debt of $150,000.[1] The NBA second deed of trust stated in part that it was given for the purpose of securing payment of the principal sum of $90,000, and:

> Any and all other indebtedness of the Trustor ... to the Beneficiary, whether contingent, now due, or hereafter to become due, and whether heretofore or contemporaneously herewith or hereafter contracted, or whether arising by operation of law out of the same or different transactions between the parties hereto or between others.

This provision is the "dragnet" clause that is the principal subject of the Lundgren appeal.

Until August 1979, Lundgren owned 10% of the shares of LPCC while McCall owned

---

1. This deed of trust was subsequently purchased from ANB by NBA in late 1984.

the other 90%. At that time a disagreement arose between the two men, and their negotiations resulted in two agreements, both of which provided that LPCC would redeem Lundgren's shares for $100,000—a $25,000 down payment and the $75,000 balance secured by Lundgren's taking a third deed of trust on Seven Mile North Yard. Each agreement also stated that "[t]he parties agree that there shall be no more than $220,000.00 of prior encumbrance on the subject property." The third deed of trust was recorded on October 23, 1979.

One of the above described agreements also stated specifically that LPCC owed Lundgren $308,466, that McCall owed him $9,448, and that LPCC did not then have the funds necessary to pay Lundgren. It set out a payment schedule for LPCC's debt and provided that the debt was secured by JMI's pledge (by McCall) of $300,000 in time certificates of deposit (TCD's) to Lundgren. These TCD's had been pledged to NBA, which agreed to subordinate its interest in them to Lundgren. NBA also allowed LPCC to assume a $49,000 debt which Lundgren owed NBA.

The parties dispute the role NBA played in these negotiations, particularly in formulating the statement that there would be no more than $220,000 of debt on Seven Mile North Yard prior to Lundgren's receiving a third deed of trust from LPCC. NBA was not a party to the agreements but apparently did have an interest in seeing the stock dispute settled because LPCC owed it a substantial sum of money. Lundgren, McCall, Lundgren's attorney, McCall's attorney, and McCall's accountant each submitted an affidavit stating that he was present at two meetings which took place in the office of Terry Kipp, then branch manager of NBA. Each affidavit indicates that Kipp participated in the negotiations and was aware of the terms of the resulting agreements; taken together, they also clearly indicate that he provided information concerning the amount due on NBA's second deed of trust with the understanding that Lundgren was using this information to calculate the amount of secured debt on Seven Mile North Yard that would be prior to his third deed of trust.

The accountant in particular stated that he and Kipp had discussed alternatives for security for Lundgren and that "it was decided" that a third deed of trust on Seven Mile North Yard would suffice since ANB held an debt of approximately $130–$140,000, and NBA held an debt of approximately $90,000.

Kipp stated in his affidavit that he did not recall taking part in substantial negotiations between Lundgren and McCall, and indicated that the only reason for his presence would have been to consider whether NBA should allow the TCD's to be repledged to Lundgren and whether NBA should allow LPCC to assume Lundgren's $49,000 debt. NBA's position is that the only information it supplied to Lundgren was the "current balance" on the second deed of trust, and that NBA never represented or understood that it was agreeing to surrender, limit, or subordinate its total security interest on Seven Mile North Yard.

Neither JMI nor LPCC made timely payment on the NBA loans. On May 1, 1980, NBA entered into a loan extension agreement with each corporation. The extension agreement with JMI described the existing indebtedness as consisting of $926,205.68 and $150,000 secured by equipment, and $89,969.73 secured by a deed of trust on Seven Mile North Yard. It also stated that the collateral for the repayment of the loan included a second deed of trust on another piece of property. The extension agreement with LPCC stated that LPCC's debt consisted of $1,506,199.83 and $60,059.34, secured by equipment, accounts receivable and inventory.

On June 18, 1980, NBA and the two corporations entered into a Loan Modification Agreement according to which NBA loaned LPCC an additional $150,000 and JMI an additional $50,000, for total debts of $1,716,000 and $1,216,000, respectively. Under the section entitled "SECURITY," the agreement provided:

> All agreements including but not limited to: security agreements, financing statements, subordination agreements, assign-

ments of lease, pledges, guarantees, deeds of trust, notes and all other agreements by and between the Borrowers, or either of them, and the Lender shall remain in full force and effect until all obligations of the Borrowers or either of them to Lender have been satisfied in full.

In addition, the promissory note issued to JMI on the consolidated loan stated that the loan was secured by, among other items, "two deeds of trust".

B. *One Mile Peger Road (Mogg Appeal).*

The property at issue in the Mogg appeal, referred to by the parties as "One Mile Peger Road," was owned by Lundgren and leased by him to LPCC, with an option to purchase, on February 15, 1976. LPCC used this property as its business premises. On February 20, 1976, NBA had taken a first deed of trust on the property to secure a loan of $530,000 made to Lundgren. This deed contained a "dragnet clause" with language identical to that in NBA's second deed of trust on Seven Mile North Yard. At the time of the loan extension agreements in May 1980, LPCC assigned its lease to NBA. The assignment secured the consolidated loans as well as future advances and other liabilities of LPCC "now existing or hereafter arising."

JMI and LPCC failed to repay their loans under after the 1980 loan extension agreements, and NBA declared a default. NBA agreed to allow McCall additional time to repay the loans or to sell LPCC. At this time, LPCC wanted to exercise the option to purchase One Mile Peger Road from Lundgren. The property apparently had appreciated in value such that its fair market value exceeded the option price of $684,730.50, and LPCC could gain more through a sale of the corporation and its assets as a package than through a foreclosure liquidation. The last day on which LPCC could exercise the option was February 28, 1983.

Negotiations took place between McCall and NBA, both represented by counsel, on February 28, 1983. NBA had previously indicated to McCall that it might help finance payment of the option price by allowing LPCC to assume Lundgren's $530,000 note and the corresponding first deed of trust on One Mile Peger Road. Apparently Lundgren still owed NBA approximately $440,000 on this note. McCall arrived at the negotiations with a check for $245,000 made payable to himself and already signed by Mogg. Mogg was not present or represented by counsel at the negotiations.

A Memorandum of Agreement between NBA and McCall resulted from the negotiations. The agreement provided that NBA would release Lundgren and allow LPCC to assume the approximately $440,000 remaining balance of the original $530,000 debt and the first deed of trust on One Mile Peger Road. (This was accomplished by an Agreement for Assumption executed by McCall and NBA.) The agreement also provided that LPCC would give NBA, as additional collateral, a third deed of trust for $100,000 on One Mile Peger Road, a second deed of trust on another piece of property, and an assignment of proceeds of any sale of LPCC or any of its assets or stock. The agreement further stated that LPCC reaffirmed all undertakings, representations and agreements it had entered into with NBA.

The parties also agreed (although this is not stated in the agreement) that Mogg would take a second deed of trust on One Mile Peger Road to secure his $245,000 investment. This deed of trust was recorded on March 6, 1983.

C. *Proceedings In The Superior Court.*

On November 25, 1983, NBA brought an action to foreclose its deeds of trust on four pieces of property owned by JMI and LPCC, including Seven Mile North Yard and One Mile Peger Road.[2] Lundgren and

2. On June 30, 1983, NBA had declared the loans and agreements of JMI and LPCC in default. JMI and LPCC thereafter filed for bankruptcy under Chapter 11 of the Bankruptcy Code. The foreclosure action was brought after NBA sought and obtained relief from the automatic stay otherwise in effect under the Bankruptcy Code. *See* 11 U.S.C. § 362.

Mogg were named as defendants who might claim interests in some of the property. NBA requested judgment against JMI, LPCC and McCall, jointly and severally, in the amount of $2,541,322.99, plus interest and other fees. In addition to seeking judgments foreclosing on the deeds of trust as to Seven Mile North Yard and One Mile Peger Road, the complaint asserted NBA's entitlement to orders selling the properties, adjudicating its interests to be prior to those of Lundgren and Mogg respectively, and applying the proceeds from the sale of the properties to the total amount due NBA.

Lundgren answered and counterclaimed, seeking a declaratory judgment that NBA's second deed of trust on Seven Mile North Yard secured only the $90,000 debt which it expressly identified. Lundgren also asserted that NBA was bound by the $220,000 "ceiling" on prior debts that was set out in the 1979 agreements between himself and McCall. Lundgren also sought a declaratory judgment that in any bidding at the foreclosure sale on Seven Mile North Yard: 1) NBA had no right to make a non-cash offset bid greater than $220,000, less the remaining obligation on the ANB first deed of trust; 2) Lundgren was entitled to match the offset bid; and 3) any purchaser of the property would purchase subject to the $220,000 ceiling with respect to any redemption made by any junior lien creditor under AS 09.35.210.

Lundgren and NBA thereafter filed cross-motions for summary judgment, and the superior court granted summary judgment in favor of NBA. The court stated that NBA's reliance on the dragnet clauses in its various deeds of trust, including the one on Seven Mile North Yard, had personally benefitted Lundgren when NBA released the $300,000 of TCD's in 1979 so that they could be repledged to Lundgren and when NBA allowed LPCC to assume Lundgren's $530,000 personal debt in 1983. The court then concluded that equity would not allow Lundgren to claim that NBA should be estopped from enforcing its drag-

net clause because it would cost him $40,-000. Lundgren subsequently moved the court for entry of final judgment pursuant to Civil Rule 54(b), and the superior court granted the motion. Lundgren then filed the instant appeal.

Mogg also answered NBA's complaint, denying NBA's allegations that its security interest on One Mile Peger Road was superior to Mogg's as to the entire debt owed NBA. Mogg asked the court to order his interest in the property to be superior to NBA's and to give him priority in the proceeds of the property if it was sold.

LPCC moved for partial summary judgment on the basis that NBA's dragnet clause in its first deed of trust on One Mile Peger Road was unenforceable as to Mogg.[3] Mogg joined in the motion, and NBA opposed and cross-moved for summary judgment. The superior court granted summary judgment for NBA. The court stated that dragnet clauses are recognized as valid contract provisions, and noted that LPCC had not shown that NBA waived its rights under the dragnet clause because no direct communications existed between NBA and Mogg, and NBA had no obligation to point out the existence of the dragnet clause to Mogg. The court further stated that Mogg could not claim that he relied on statements or actions at the negotiations since he had given McCall the check prior to the negotiations. The court concluded that it was unreasonable of Mogg to expect non-enforcement of the dragnet clause under the circumstances.

Mogg then moved the superior court for entry of a final judgment pursuant to Civil Rule 54(b). The court ordered final judgment, and Mogg then appealed to this court. We subsequently consolidated the Mogg and Lundgren appeals.

Prior to the commencement of trial in its judicial foreclosure action, NBA moved to dismiss the counterclaim in which Lundgren sought a declaratory judgment enforcing against NBA the $220,000 "ceiling" of prior debt on Seven Mile North Yard. Lundgren opposed, and the superior court

---

3. LPCC made the motion because the resolution of the issue in Mogg's favor was necessary to confirmation of LPCC's proposed plan of reorganization in its bankruptcy proceeding.

denied the motion stating that the counterclaim was an "integral part" of the summary judgment ruling against Lundgren pending on appeal. The court concluded that dismissal of Lundgren's counterclaim would be inappropriate since the question of NBA's dragnet clause was pending in this court.

Apart from Lundgren's opposition to the dismissal motion, Lundgren and Mogg took no part in the activities preceding the trial in the foreclosure action. NBA, LPCC, JMI, McCall, and several other defendants entered into a stipulation for entry of partial judgment on June 3, 1985. The stipulation stated that partial judgment should enter against LPCC and JMI jointly and severally for $2,668,486.77 plus interest. The stipulation also stated that the properties of JMI and LPCC should be sold to pay the judgment and that NBA should be entitled to enter offset bids at any foreclosure sale, up to the agreed judgment amount. The superior court accepted the stipulation and agreed to enter a default against all parties failing to appear.

On June 19, 1985, the superior court entered a partial judgment and order of sale. The document was prepared by NBA. The judgment stated in part that Mogg and Lundgren had not appeared at trial and that default was entered against them. The judgment also stated that Mogg and Lundgren had neither proved the amount and validity of their claims nor contested the amount and validity of NBA's deed of trust liens, and that all interests, liens, and claims of Mogg and Lundgren in One Mile Peger Road and Seven Mile North Yard, respectively, were barred, foreclosed and ordered to be sold.

Thereafter, Lundgren and Mogg both moved for relief from the partial judgment. They argued that the superior court did not have jurisdiction to affect their interests in the properties arising out of their deeds of trust since the issue of the priority of their deeds of trust was on appeal to this court. It appears that neither sought to block the foreclosure sale, but they wanted to ensure that the partial judgment and subsequent

sale would not render their pending appeals moot. NBA opposed the motions, and the superior court denied them, stating: "[I]f Mr. Mogg and/or Mr. Lundgren are successful on appeal, they can then make whatever claims they still have against NBA at that time, whatever those are."

The foreclosure sale was held. NBA offset bid $716,494.59 on One Mile Peger Road and $571,105.35 on Seven Mile North and South Yards, which were sold as one parcel. Lundgren bid $220,000 in cash on the Seven Mile properties; apparently there were no other bids on One Mile Peger Road. NBA was declared the high bidder on the properties.

NBA moved to confirm the sale. Lundgren opposed the motion, arguing in part that he was the higher bidder. The superior court confirmed the sale on July 31, 1985, and entered a deficiency judgment of $1,353,040.67 for NBA. Mogg and Lundgren appealed. We consolidated these appeals with each other and with the other two consolidated appeals.

## II. LUNDGREN APPEAL.

### A. *The Superior Court's Application of Equitable Principles to Prevent Lundgren From Asserting That NBA's Dragnet Clause Should Not Apply.*

The superior court granted summary judgment against Lundgren on the principle that "one who seeks equity, must do equity":

> Since NBA's reliance on the "dragnet" clause has resulted in personal benefits to Lundgren in excess of $800,000, equity will not allow him to claim that the bank should be estopped from enforcing the same clause because it will cost him $40,000.

The principle on which the superior court relied is a widely accepted one. The notion is essentially that a party seeking equitable relief from another party's actions must be prepared to return any benefits he received because of those actions.[4] Implicit in the

---

4. *See, e.g., George v. W–G Fertilizer, Inc.,* 205    Kan. 360, 469 P.2d 459, 462, 464 (1970) (plain-

superior court's decision is that in order for Lundgren to recover the $40,000 (the balance on his third deed of trust secured by Seven Mile North Yard) as equitable relief from NBA's use of its dragnet clause, he must be willing to "do equity" by returning the $800,000 in "benefits" he received from NBA's use of its dragnet clause. Since Lundgren obviously would not be willing to do this, equity will not enforce his claim.[5]

We conclude, however, that the superior court incorrectly applied this equitable principle to the facts of this case. The principle necessarily implies that the "adverse equity" must grow out of the controversy before the court. In other words, a party seeking equity from another party must "do equity" only if the benefits received from that party were somehow derived from the equity the party is seeking.

The benefits which Lundgren received from NBA were NBA's subordination of the $300,000 in TCD's to Lundgren to secure McCall's debt and NBA's agreement to the assumption by LPCC of Lundgren's $49,000 personal debt as part of the 1979 stock settlement. Further, NBA allowed LPCC to assume Lundgren's $530,000 note to NBA as part of the purchase price in the 1983 sale of One Mile Peger Road. NBA now argues that these benefits increased the overall indebtedness of LPCC and JMI to NBA, and that in taking various actions with respect to its debtors—including those actions which benefitted Lundgren—NBA had believed that all collateral pledged would secure all debts and relied on all its dragnet clauses.

The facts indicate that Lundgren would have received the above-described benefits from NBA notwithstanding the dragnet clauses. Lundgren obtained these benefits as part of the 1979 stock settlement agreement between himself and McCall. It seems clear that NBA took these actions in order to facilitate the resolution of the stock dispute between Lundgren and McCall so that LPCC would be in a better position to repay the large debt it owed to NBA. While NBA may have expected its dragnet clauses to apply, such an expectation was not the motivating factor behind NBA's actions towards Lundgren.[6]

NBA released Lundgren from his $530,000 personal note and allowed LPCC to assume this debt, as part of LPCC's payment to Lundgren for the purchase of One Mile Peger Road. NBA's motivation here again was to improve the chances that it would receive repayment of part of the large debt owed by LPCC. Affidavits submitted by NBA indicate its preference for a sale of LPCC, with the proceeds applied against the debt, rather than a declaration of default. NBA wanted LPCC to purchase One Mile Peger Road, which the corporation used as its place of business, because the perceived tax advantages of the transaction would make LPCC more attractive to prospective purchasers. In addition, the record contains assertions that the mar-

tiffs are entitled to be reinstated as shareholders but cannot retain downpayment paid them by defendant); *Horton v. Horton*, 695 P.2d 102, 107 (Utah 1984) (plaintiff who obtained set-aside of defendant's fraudulently acquired quitclaim deed must subordinate his interest in mortgages in the amount of loans that defendant repaid).

5. We disagree with Lundgen's contention that the superior court could not have applied this equitable principle to his claim that the parties' intent as to the second deed of trust on Seven Mile North Yard should be construed so as not to include "other debt" under the dragnet clause. The analytical device employed by some courts of construing a dragnet clause narrowly and looking at extrinsic evidence, while expressed in terms of the parties' intent, is essentially the result of the court's concept of equity and fairness. *See First Sec. Bank v. Shiew*, 609 P.2d 952, 954, 955 (Utah 1980) (there

is a consensus that dragnet clauses are not favored in equity); *Wong v. Beneficial Sav. and Loan Ass'n*, 56 Cal.App.3d 286, 128 Cal Rptr. 338, 345 (1976) (since relief from the effect of dragnet clauses involves principles of equity, court notes the "lack of bona fides" on behalf of plaintiffs and refuses to construe dragnet clause in their favor); *Everett Credit Union v. Allied Ambulance Servs.*, 12 Mass.App. 343, 424 N.E.2d 1142, 1145 (1981).

6. Moreover, NBA's release of the $300,000 in TCD's cannot possibly be viewed as an action in reliance on the dragnet clause, since this action decreased the total amount of secured debt owed to NBA by LPCC. LPCC's assumption of Lundgren's $49,000 note did increase the total debt, but, as stated above, we do not view the dragnet clause as the motivating force behind NBA's actions here.

ket value of the property had risen above the option price, thus enhancing the desirability to NBA and LPCC of a purchase by LPCC.[7]

The pertinent question here is not whether NBA intended to use its dragnet clause but whether Lundgren received his benefits as a result of such intent. Our study of the record causes us to conclude that there is no factual dispute that Lundgren received the benefits from NBA for reasons other than NBA's reliance on its dragnet clause in its second deed of trust on the property. We therefore hold that the superior court erred in granting summary judgment in favor of NBA on the principle that one who seeks equity must do equity.[8]

B. *Should the Dragnet Clause in NBA's Second Deed of Trust on Seven Mile North Yard be Construed so That the Deed of Trust Secures the Entire Debt Owed NBA?*

▮ We address an issue of first impression in deciding on the appropriate construction of a dragnet clause.[9] A dragnet clause in a mortgage or deed of trust is a provision which makes the real property security for other debts which the mortgagor or trustor already owes or may in the future owe to the mortgagee or beneficiary. *See* G. Nelson and D. Whitman, *Real Estate Finance Law* § 12.8, at 898 (2d. ed. 1985). We note that courts in other jurisdictions have tended to construe such clauses narrowly against the mortgagee or beneficiary but differ greatly in the effect which they have ascribed to particular clauses. *See generally id.* at 900–01; Annotation, *Debts Included in Provision of Mortgage Purporting to Cover All Future and Existing Debts (Dragnet Clause)— Modern Status,* 3 A.L.R. 4th 690 (1981).

Some courts hold that the clear and unambiguous language of the dragnet clause is the best way to determine the intent of the parties, so that if the clause states that the collateral secures all debt now or hereafter existing, the intent of the parties must be deemed to have been to secure all debt. *See, e.g., Riss Tanning Corp. v. United States,* 468 F.2d 1211, 1213 (2d Cir.1972); *Robert C. Roy Agency v. Sun First Nat'l Bank,* 468 So.2d 399, 402, 405 (Fla.App.1985); *Newton County Bank, Louin Branch Office v. Jones,* 299 So.2d 215, 218 (Miss.1974).

Many courts, however, have refused to rely solely on the language of the dragnet clause and instead have sought to determine the "true intent" of the parties. Decisions adopting this approach have pointed out that such clauses are usually "boilerplate" in a document drafted by the lender, seldom the subject of negotiation, and often the debtor is unaware of its presence or implications. *See, e.g., Wong v. Beneficial Sav. and Loan Ass'n.,* 56 Cal.App.3d 286, 128 Cal.Rptr. 338, 342 (1976); *First Sec. Bank v. Shiew,* 609 P.2d 952, 957 (Utah 1980). These courts often opine that although dragnet clauses are not invalid, they will be carefully scrutinized and strictly construed; the courts express concern that the debtor may be caught unaware of the indebtedness that the agreement secures and consequently become the "economic serf" of the creditors. *See, e.g., Akamine & Sons, Ltd. v. American Sec. Bank,* 50 Hawaii 304, 440 P.2d 262, 267 (1968); *Emporia State Bank and Trust Co. v. Mounkes,* 214 Kan. 178, 519 P.2d 618 (1974) (quoting with approval *Akamine,* 440 P.2d at 267); *Shiew,* 609 P.2d at 955.

---

7. In addition, NBA explicitly obtained additional collateral from LPCC for this increase in debt, including a third deed of trust on One Mile Peger Road, a second deed of trust on another piece of property, and assignments of all proceeds of any sale of LPCC. This fact again suggests that the actions of NBA which benefited Lundgren were not motivated by the dragnet clause in NBA's second deed of trust.

8. Summary judgment is proper only if there are no genuine issues as to any material fact and one party is entitled to judgment as a matter of law. Alaska R.Civ.P. 56(c).

9. *Alaska Statebank v. Kirschbaum,* 662 P.2d 939 (Alaska 1983), is not dispositive. There the borrowers did not dispute that the dragnet clause in each of two security agreements meant that the collateral securing that loan also secured the other loan. *See id.* at 940–41 & nn. 4, 6.

Courts have adopted various approaches to determine whether the nature of the "other debt" should bring it within the dragnet clause. Some have held that debts incurred prior to the security agreement ("antecedent debts") will not come within the dragnet clause unless such debts were specifically identified in the security agreement. *See, e.g., National Bank v. Blankenship*, 177 F.Supp. 667, 673–74 (E.D. Ark 1959), *aff'd sub nom. National Bank v. General Mills*, 283 F.2d 574 (8th Cir.1960) (applying Arkansas law); *Underwood v. Jarvis*, 358 So.2d 731, 735 (Ala.1978); *First v. Byrne*, 238 Iowa 712, 28 N.W.2d 509, 512 (1947); *First Nat'l Bank & Trust Co. v. Lygrisse*, 231 Kan. 595, 647 P.2d 1268, 1272 (1982). A key rationale underlying these holdings is that since the antecedent debt is already owed by the borrower to the lender, the parties would have had no good reason not to identify it in the subsequent security instrument if they had truly intended the deed of trust or mortgage to cover it. *Blankenship*, 177 F.2d at 673–74; *Underwood*, 358 So.2d at 735; *Byrne*, 28 N.W.2d at 512. Several decisions have modified this rule by holding that if the parties expressly agree in a subsequent instrument that a security agreement containing the dragnet clause extends to an antecedent debt specifically referred to in the subsequent instrument then the dragnet clause will apply to the antecedent debt. *Kamaole Resort Twenty-One v. Ficke Hawaiian Investments*, 60 Hawaii 413, 591 P.2d 104, 112 (1979); *Lygrisse*, 647 P.2d at 1273.

Courts have also expressed the view that "other debt" is not encompassed by a dragnet clause unless it is of the same type or character as the debt explicitly covered by the security instrument containing the dragnet clause or unless the other loan specifically refers to the prior mortgage or deed of trust containing the dragnet clause. *See Wong*, 128 Cal.Rptr. at 343–44 (quoting with approval R. Bernhardt, *California Real Estate Secured Transactions* §§ 4.21, 4.23 (1970)) (holding that the burden is on the party seeking enforcement of the dragnet clause to show that both parties intended the other debt to be secured by the instrument containing the clause); *Mounkes*, 519 P.2d at 623; *accord Canal Nat'l Bank v. Becker*, 431 A.2d 71, 75 (Me.1981); *e.g., Shiew*, 609 P.2d at 957–58 (mortgage on home with dragnet clause held not to secure later loan for cattle-raising venture). Some courts also inquire as to whether the "other debt" is separately secured. If it is, and does not refer back to the mortgage or deed of trust containing the dragnet clause, it is considered evidence that the parties did not intend the dragnet clause to apply to that debt. *See Blankenship*, 177 F.Supp. at 674; *Wong*, 128 Cal.Rptr. at 343, 344 (quoting with approval R. Bernhardt, *supra*, § 4.24, at 159–60); *Becker*, 431 A.2d at 75; *Shiew*, 609 P.2d at 957.

Our study of the foregoing authorities leads us to reject an approach which enforces dragnet clauses uncritically. Here we conclude that the dragnet clause contained in NBA's second deed of trust on Seven Mile North Yard does not encompass any of JMI and LPCC's approximately $2.7 million of antecedent debt to NBA.

In reaching this conclusion, we are persuaded by those authorities which hold that antecedent debts will not be included within the scope of a dragnet clause unless such debts are specifically identified in the security agreement. Identification and incorporation of such debts in the security agreement will provide accurate and accessible notice as to the extent of indebtedness secured by the subject property not only to the parties to the agreement, but also to all those who subsequently deal with the parties and the property. Of controlling significance is the fact that this approach will thus furnish protection for junior lienholders. In the case at bar, third party lenders would have known with certainty that the total encumbrances on Seven Mile North Yard far exceeded the amount of contemporaneous debt if the antecedent debts sought to be included within the dragnet clause of NBA's second deed of trust had been identified and listed. The second deed of trust did not, apart from the general wording of the dragnet clause, refer to the $2.7 million in antecedent debts; it con-

tained an explicit reference only to the $90,000 contemporaneous debt.

We perceive no countervailing policy reasons that would militate against including antecedent debts within the coverage of a dragnet clause only when such debts are specifically identified in the security agreement. Examination of the arguments advanced by NBA against imposing a listing or identification requirement leaves us unpersuaded that any have merit. The obvious rejoinder to NBA's argument that considerations of administrative convenience should prevent us from imposing such a requirement is that the parties are aware of the existence of these debts and thus the lender can, without any significant burden, specify any pre-existing debt intended to be included within the ambit of the dragnet clause. The clerical effort involved is simply insignificant in comparison to the potential risks to junior lienholders if the antecedent debts are not described in the security agreement. Equally unpersuasive are NBA's speculative assertions that a listing requirement will have a detrimental impact on commerce in general as well as on commercial lending institutions in particular. Furthermore, NBA's reliance on Alaska's recording statutes (AS 34.15.-260, .310), lien statutes (AS 34.35.060), and Uniform Commercial Code (AS 45.09.-101–.507, which allows security interests in future advances with respect to personalty) as indicative of a legislative policy which would recognize dragnet clauses in real property security agreements is misplaced. None of these statutes is relevant to the resolution of the issue under scrutiny.

We also believe that dragnet clauses should be carefully scrutinized and strictly construed with respect to their coverage of future advances. In light of the authorities previously cited, the following guidelines should be adhered to in determining whether future advances are secured by a particular dragnet clause. First, the burden is upon the proponent of

the clause to demonstrate that the parties intended that the future advance or "other debt" would be secured by the dragnet clause. Second, the fact that the other debt is not of the same type or character as the debt explicitly covered by the deed of trust or mortgage containing the dragnet clause is evidence that the parties did not intend the dragnet clause to cover it. Third, the fact that the other debt is separately secured and does not refer back to the mortgage or deed of trust which contains the dragnet clause is also evidence that the parties did not intend the dragnet clause to apply to that debt.

Based on our holding herein concerning the inclusion of antecedent debts with the scope of a dragnet clause, we find that the superior court here erred in granting summary judgment against Lundgren and therefore remand this matter for further proceedings consistent with the foregoing. On remand, NBA may not introduce facts to support its contention that Lundgren is equitably estopped from challenging the dragnet clause in favor of NBA.

III. MOGG APPEAL: SHOULD THE DRAGNET CLAUSE IN NBA'S FIRST DEED OF TRUST ON ONE MILE PEGER ROAD BE CONSTRUED SO THAT THE DEED OF TRUST SECURES THE ENTIRE DEBT OWED TO NBA?

In granting summary judgment in favor of NBA, the superior court held that dragnet clauses are valid contract provisions and that the particular clause in issue here should be applied as written since LPCC failed to show that NBA waived its rights to enforce its first deed of trust on One Mile Peger Road against the entire debt.[10]

The parties dispute whether the lender (NBA) and the debtor (LPCC, which assumed the first deed of trust from Lundgren) intended that the dragnet clause apply to all other loans from NBA to LPCC. Mogg argues that the dragnet clause

---

**10.** As previously noted, Mogg joined in LPCC's motion for summary judgment. Although no direct communications existed between Mogg and NBA, NBA was aware of Mogg's intervening $245,000 loan and second deed of trust on One Mile Peger Road. NBA held a $100,000 third deed of trust on the property.

should not encompass those loans because the assumption agreement contains no mention of any of them, even though each predated LPCC's assumption of the deed of trust. Mogg also argues that the clause should not cover the other loans because each was separately secured and made to purchase personal property to be sold as inventory or used as equipment, whereas the loan secured by the deed of trust was for real property to be used as a business.

According to Mogg, the relevant extrinsic evidence also shows that NBA intended at the time of entering the assumption agreement that Mogg would be fully secured by his second deed of trust. He cites a bankruptcy court hearing on August 19, 1983, during which William Granger, who represented NBA at the negotiations, gave the following testimony:

Q: In trying to determine what value NBA could achieve upon a sale of the Lundgren Pacific Yard, did you assume that NBA would have to pay the junior lienholder, [Mogg]?

A: At one point, yes, I did. I learned something new about our documentation and other people's documentation, and that kind of thing, in this case every day. And, at one point, I did assume that, and I have since changed my opinion of that.

Q: Is that because of the so-called dragnet clause you were talking about?

A: Yes.

Mogg argues that NBA would not have felt it necessary to take a third deed of trust on the property if it believed and intended that the dragnet clause in its first deed of trust secured all debts. Mogg finally asserts that the combined principal amounts of the three deeds of trust on One Mile Peger Road approximate the fair market value of the property, thus indicating that parties intended that those deeds of trust only secure the property up to their principal amounts.

NBA replies that the language of the agreements signed by NBA and McCall in February 1983 clearly indicates the intent of the parties that the dragnet clause apply. NBA points out that the Memorandum of Agreement reaffirms all previous agreements it entered with McCall's corporations, each of which contained a dragnet clause, and further provides that LPCC is assuming the deed of trust according to its terms. Moreover, the assumption agreement states that "the duties and obligations of the Buyer, the rights of the lender and the priority of the note and deed of trust shall not be affected by this agreement." According to NBA, the fact that LPCC assigned NBA all proceeds of any sale of LPCC or any of its assets or stock also indicates that the parties did not intend that NBA's interest in LPCC would be subordinated in any way to Mogg's deed of trust.

In response to Mogg's arguments concerning the need for a third deed of trust on the property, NBA takes the position that it took the deed of trust to prevent LPCC from further mortgaging the property. NBA also points out that Granger's testimony was made in the context of a discussion of his assumptions regarding the best and worst possible scenarios for NBA's recovery on its collateral. NBA finally suggests that LPCC's unilateral deletion of the dragnet clause from NBA's third deed of trust implies recognition that the dragnet clause on the first deed of trust would apply to the other loans.

The rule adopted herein in the Lundgren appeal as to antecedent debts is dispositive of the Mogg appeal. Accordingly, we reverse the superior court's grant of summary judgment against Mogg and remand for further proceedings not inconsistent with this opinion.

## IV. SECOND APPEALS: EFFECT OF THE SUPERIOR COURT'S PARTIAL JUDGMENT AND ORDER OF SALE AND THE SUBSEQUENT SALES OF THE PROPERTIES.

NBA's action to foreclose on the respective properties continued following entry of final judgments against Lundgren and Mogg on their claims contesting NBA's use of its dragnet clauses. Pursuant to a stipulation between NBA, LPCC, JMI, McCall and several other defendants, the

superior court entered a partial judgment and order of sale.

The judgment stated that NBA should recover $2,668,486.77 from JMI and LPCC, jointly and severally, and that default was entered against Lundgren and Mogg, who had not appeared at trial. The superior court denied the relief from the partial judgment requested by both Mogg and Lundgren, and NBA subsequently purchased the properties through offset bidding at the foreclosure sale. Lundgren and Mogg now object to the superior court's judgment to the extent that it may preclude them from obtaining relief in the event they prevail here on their respective appeals from the Civil Rule 54(b) final judgments. Neither Lundgren nor Mogg sought to stay the sale and neither argues that the properties should not have been sold. They do argue that this order and the subsequent sale of the properties should not affect their ability to obtain relief from this court and that if it does have this effect, the superior court lacked jurisdiction to enter such an order.[11]

NBA apparently argues that the judgment and order of sale extinguished Lundgren's and Mogg's right to obtain anything as lien creditors from the subsequent foreclosure sale. NBA asserts that the Civil Rule 54(b) judgments against Mogg and Lundgren established only the relative priorities of the deeds between the parties, and that remaining issues for trial were establishing the amounts and validity of those liens. NBA's position is that since Mogg and Lundgren did not appear at trial to establish the validity and amount of the liens, the judgment foreclosing their interest and allowing NBA to offset bid up to the amount of its deficiency judgment eliminates their right to assert their liens and presumably therefore eliminates their right to obtain any remedy from NBA that would have flowed from their liens at the foreclosure sale.

We conclude that the superior court's partial judgment and order of sale should not be construed to affect Lundgren's and Mogg's abilities to obtain a remedy since our holdings regarding the scope of NBA's dragnet clauses alter the priorities of their respective deeds of trust in relation to those held by NBA.[12] It would be unfair to construe the superior court's partial judgment and order otherwise. While in theory Lundgren and Mogg could have appeared in order to "establish" the amount of their liens, this would have been a pointless exercise given the final judgments against them, which in effect held that any liens they might have would be worthless. NBA is incorrect that Mogg and Lundgren never asserted that they had liens against the properties, as their answers to NBA's complaint asserted that they had secured interests in the properties which had priority over much of NBA's alleged security interests. Even if Mogg and Lundgren had sought at that time to prove the amounts of their liens, this would not have changed the result; the superior court still would have considered the liens worthless by virtue of its prior summary judgment rulings and presumably would have ordered the

11. The relief Mogg requests is a money judgment in the amount of his $245,000 lien (plus interest) if he prevails in his first appeal. He argues that if the only debt prior to his security interest from his second deed of trust on One Mile Peger Road was the principal debt on NBA's first deed of trust (which he states is $442,786), he would have been entitled to $245,000 of the proceeds of the sale of the property (to NBA for $716,494.59) in excess of $442,786. In effect, Mogg concludes that NBA has been unjustly enriched by $245,000 and that a constructive trust in that amount should be imposed on NBA.

The relief Lundgren requests should he prevail is an order directing the sale of Seven Mile North Yard to him for $220,000. His rationale is that NBA could have incurred no more than that amount in senior debt. Lundgren argues that NBA could only offset bid up to the first $220,000 of debt on which it had seniority, and that as to the next $40,000—the amount owed Lundgren on his deed of trust—it had to bid cash. Therefore, he argues NBA's entire offset bid of $571,000 was invalid, leaving his own cash bid of $220,000 as the only valid bid, which therefore entitles him to be declared high bidder and receive the property.

12. We therefore do not reach the issue of whether it would have been proper for the superior court to have limited appellants' right to obtain a remedy in the event they were successful on the appeal of their Civil Rule 54(b) judgments.

properties sold subject to NBA's priority to offset bid up to the full amount of its debt.

Our holdings regarding the inclusion of antecedent debts within the scope of a dragnet clause changes the previously adjudged priorities between NBA's deeds of trust and those of Lundgren and Mogg. We therefore hold that the foreclosure sale of the two properties should be vacated and the sale renoticed.[13] In the event that intervening third party rights preclude this remedy, then the superior court should hold a hearing in order to devise a remedy for Lundgren and Mogg that is fair under the circumstances.[14]

REVERSED and REMANDED for further proceedings not inconsistent with this opinion.

13. It is clear from the record that all parties to the foreclosure proceedings regarding Seven Mile North Yard and One Mile Peger Road were mistaken as to the priorities involved.

14. NBA argued below that Lundgren and Mogg would not have obtained any proceeds if their debt had been senior to part of NBA's debt at the time of the sale, implying that NBA would have offset bid only up to the amount of its seniority. NBA suggested that the likely scenario would have been that neither Lundgren nor Mogg would have bid the cash necessary to outbid NBA and NBA therefore would have obtained the properties for that lesser bid, with no proceeds remaining for the junior debtors since the proceeds received would equal the senior debt. This is not, however, the bid NBA chose to make, and if NBA was concerned about the possibility that Mogg and Lundgren might win on appeal, then it should not have gone ahead with the foreclosure sale until the appeals were decided.