[No. D040165. Fourth Dist., Div. One. June 25, 2003.]

KARL E. FISCHER et al., Plaintiffs and Appellants, v.
FIRST INTERNATIONAL BANK, Defendant and Respondent;
INVESTORS TITLE COMPANY, Defendant and Appellant.

1434

## COUNSEL

Bruckner & Walker, William L. Bruckner and Charles F. Walker for Plaintiffs and Appellants.

Browne & Woods, Michael J. Olecki and Sonia Y. Lee for Defendant and Appellant.

Solomon, Grindle, Silverman & Spinella and Stephen M. Spinella for Defendant and Respondent.

## OPINION

**AARON, J.—**

### INTRODUCTION

This matter is before the court on two separate appeals. Plaintiffs Karl and Pamela Fischer appeal from a summary judgment order and final judgment in favor of defendant First International Bank (FIB or the bank). Defendant Investors Title Company (ITC or escrow company) appeals from a subsequent order granting the Fischers' motion for new trial as to ITC.

The Fishers' appeal presents the following question: When a bank enters into a written loan agreement that specifies the collateral for two different

loans, and does not state that the loans will be cross-collateralized against each other, may the bank subsequently enforce a broadly worded "dragnet" clause contained in the fine print of a standard form deed of trust securing one of the loans? On the particular facts of this case, we conclude that the trial court erred by granting summary judgment in defendants' favor on this issue.

With regard to ITC's appeal, we find that the trial court lacked jurisdiction to grant a new trial as to ITC because the court failed to act within the 60-day jurisdictional time period after filing and service of the notice of motion and motion for new trial. (Code Civ. Proc., § 660.) However, we direct the trial court on remand to exercise its inherent authority to reconsider its order granting summary judgment for ITC in light of this opinion.

I.

FACTUAL AND PROCEDURAL BACKGROUND

██ Because the Fischers' appeal pertains to an order granting summary judgment in favor of the defendants, the court must view the evidence in the light most favorable to plaintiffs. (*Aguilar v. Atlantic Richfield Co.* (2001) 25 Cal.4th 826, 844-845 [107 Cal.Rptr.2d 841, 24 P.3d 493].)

In 1989, Karl and Pamela Fischer purchased two contiguous commercial lots located at 2102 Main Street in Ramona, California, for $310,000. They took out a $707,000 construction loan from FIB and invested another $750,000 to construct a large family dining and recreation center on the property.

In 1998, the Fischers entered into negotiations with FIB for two additional loans: a takeout loan in the amount of $730,000 to pay off the existing construction loan (Loan #1) and an equipment loan in the amount of $325,000 (Loan #2). On September 14, 1998, FIB and the Fischers entered into a written agreement regarding the terms and conditions of the loans (the September Agreement). The agreement was drafted by FIB in the form of a letter to the Fischers signed by both a loan officer and a senior vice-president, to be countersigned by the Fischers. According to the loan officer, the September Agreement was intended to define the terms of the loans to the Fischers.

The September Agreement specified the identities of the borrowers, the dollar amounts of the loans, the purpose of each loan, the term of each loan, the interest rates, loan fees and packaging fees, the terms pertaining to

prepayment and assumability, and the estimated closing costs. The September Agreement also included the following provision specifying the collateral for each of the two loans:

Collateral:

Loan #1: First deed of trust on commercial property located at 2102 Main Street, Ramona, CA
Loan #2: Second deed of trust on commercial property located at 2102 Main Street, Ramona, CA
Second deed of trust on single-family residence located at 14382 Blue Sage Road, Poway, CA

The agreement included express conditions pertaining to each of the loans. One of the conditions for Loan #2 was a "second deed of trust on the residential property located at 14382 Blue Sage Road, Poway, CA 92064." There was no such condition for Loan #1.

The September Agreement directed the Fischers to sign and return the agreement with a check for $3,000 to cover the Small Business Administration (SBA) packaging fees and the appraisal fees. At the end of the letter, the bank included signature lines marked "Acknowledged and Agreed" for the Fischers to sign. The Fischers signed the agreement and paid the requested $3,000 fee to FIB.

One of the stated conditions of each loan was receipt of a loan guarantee and authorization from the SBA. The applications submitted to the SBA, as well as the SBA's written approvals setting forth the conditions of the loans, indicated that the Blue Sage residence would be used as collateral for Loan #2, but not for Loan #1. The SBA documentation did not include any reference to cross-collateralization of the loans. By signing the SBA approval papers, FIB and the Fischers accepted the SBA's stated conditions of the loans.

The signed September Agreement contained no reference to cross-collateralization of the loans. According to the Fischers, they "specifically negotiated" the loan agreement so that their Blue Sage residence would not be collateral for Loan #1. This was one of their "main objectives" in negotiating the agreement.

On September 30, 1998, the Fischers went to the bank to sign final loan documents, including a deed of trust for their residence. They met with FIB Vice-President Steve Pollett. The Fischers brought a copy of the September

Agreement with them to this meeting. According to the Fischers, Pollett assured them that their home was collateral only for Loan #2, as stated in the September Agreement. The Fischers pointed out that the proposed deed of trust incorrectly stated that their home would be collateral for both loans. Pollett agreed that this was a mistake, and told the Fischers they did not have to sign the incorrect deed of trust because their home was not needed as collateral for Loan #1, but rather, only for Loan #2. The bank subsequently changed the deed of trust so that the definition of the word "note" referred only to the $350,000 loan for Loan #2.

According to Mr. Fischer, Pollett said that if the Fischers were to sell their Blue Sage residence, any equity from the sale would be used only to pay off the balance of Loan #2. Pollett stated that "the simple and straightword terms in [the September Agreement] defined the terms of the loan and were more important than all the technical language in the other documents." According to Mr. Fischer, Pollett "told us that if we sold our home, that any funds left over after paying off the loan for $325,000 would be ours to use as we pleased. We believed him and relied upon his statements and assurances to us that comported with the September 14, 1998 contract."

The deed of trust signed by the Fischers for their Blue Sage residence stated in bold and capital letters that the deed was "GIVEN TO SECURE (1) PAYMENT OF THE INDEBTEDNESS AND (2) PERFORMANCE OF ANY AND ALL OBLIGATIONS OF TRUSTOR UNDER THE NOTE, THE RELATED DOCUMENTS, AND THIS DEED OF TRUST." On a separate page of definitions, the word "Note" was defined to mean "the Note dated September 30, 1998 in the principal amount of $325,000." The phrase "in the principal amount of $325,000" was inserted in larger print than the other definitions contained on the standard form. However, the word "Indebtedness" was broadly defined in the fine print as follows: "The word 'Indebtedness' means all principal and interest payable under the Note and any amounts expended or advanced by Lender to discharge obligations of Trustor or expenses incurred by Trustee or Lender to enforce obligations of Trustor under this Deed of Trust, together with interest on such amounts as provided in this Deed of Trust. In addition to the Note, the word 'Indebtedness' includes all obligations, debts and liabilities, plus interest thereon, of Borrower to Lender, or any one or more of them, as well as all claims by Lender against Borrower, or any one or more of them, whether now existing or hereafter arising, whether related or unrelated to the purpose of the Note, whether voluntary or otherwise, whether due or not due, absolute or contingent, liquidated or unliquidated and whether Borrower may be liable individually or jointly with others, whether obligated as guarantor or otherwise, and whether recovery upon such Indebtedness may be or hereafter may

become barred by any statute of limitations, and whether such Indebteness may be or hereafter may become otherwise unenforceable."

The deed of trust also included a "Due on Sale" provision giving FIB the right to "declare immediately due and payable all sums secured by this Deed of Trust upon the sale or transfer, without the Lender's prior written consent, of all or any part" of the Blue Sage residence.

Finally, the deed of trust contained a provision stating: "This Deed of Trust, *together with any Related Documents*, constitutes the entire understanding and agreement of the parties as to the matters set forth in this Deed of Trust." (Italics added.) The phrase "Related Documents" was defined to "mean and include without limitation all promissory notes, credit agreements, loan agreements, environmental agreements, guaranties, security agreements, mortgages, deeds of trust, and all other instruments, agreements and documents, whether now or hereafter existing, executed in connection with the Indebtedness."

In 1999, the Fischers decided to sell their Blue Sage residence. Before listing the property, Mrs. Fischer spoke to Pollett. According to Mrs. Fischer, Pollett told her that if the house were sold, Loan #2 would have to be paid off, but that the Fischers could retain any excess proceeds from the sale. In reliance upon Pollett's representation and their own understanding of the loan agreement, the Fischers sold their home. After paying off Loan #2 through escrow, there was $125,000 left over from the sale.

The Fischers requested that the escrow company, ITC, pay the remaining $125,000 to the Fischers' construction company, K&F Construction. However, FIB demanded that any funds remaining from the sale of the residence be applied to Loan #1. ITC initially complied with the Fischers' request and issued a check for $125,000 to K&F Construction, but ITC stopped payment on the check after FIB inquired of ITC why its payment was "short," and informed ITC that the Fischers were not to receive any cash out from the sale. ITC then issued a check to FIB for $125,000. After the Fischers complained that FIB had no right to the money, FIB returned $25,000 of the total to the Fischers.

According to the Fischers, they would not have sold their home if they had known that FIB was going to take the money that remained after the balance of Loan #2 was paid. The Fischers allege that they intended to use the proceeds from the sale of their home as working capital, and that without these funds, they were forced to sell their commercial property and business for below fair market value.

After the sale of the Blue Sage residence, Pollett told his friend Stephen Fitch, an attorney, that FIB did not have the right to take all the proceeds from the sale. Pollett said that FIB had the right to $325,000 to pay off Loan #2, but did not have the right to take the remaining $125,000.

The Fischers filed suit against FIB and ITC alleging breach of contract, conversion and misappropriation of money, breach of fiduciary duty, fraud in the inducement, negligent misrepresentation, breach of the implied covenant of good faith and fair dealing, and false promise.

The trial court granted summary judgment in favor of both defendants. In its ruling, the court assumed that the September Agreement was a "Related Document" expressly incorporated by the terms set forth in the deed of trust. However, the court found that the definition of "Indebtedness" in the trust deed gave FIB the right to receive the net proceeds from the sale of the Fischers' residence, and to apply those funds to the balance of both loans. The court concluded that there was no conflict between the September Agreement and the trust deed, and no ambiguity in the overall meaning of the contract. In light of what the court viewed as the express contractual agreement between the parties, the court found no triable issues of fact as to the bank. With regard to the claims against ITC, the court ruled that summary judgment for ITC was warranted because the Fischers had not sustained any damages as a matter of law, since the court found the bank was entitled to receive the net proceeds from the sale of the residence.

On January 14, 2002, the Fischers filed a notice of motion and motion for new trial as to ITC. In the motion, the Fischers asserted that the order granting summary judgment in ITC's favor was erroneous because the Fischers were entitled to recover attorney fees from ITC as an element of damages under the "tort of another" doctrine, even if the bank had a right to the net proceeds of the sale. According to the Fischers, ITC breached its fiduciary duties by releasing the money to FIB rather than interpleading the funds, thereby causing the Fischers to incur the expenses of this litigation.

On March 29, 2002, the court granted the Fischers' motion for new trial as to ITC. Applying the "tort of another" doctrine, the court found that it had "improperly granted summary judgment in favor of ITC."

The court entered judgment for FIB on April 22, 2002. The Fischers appeal from this judgment. ITC separately appeals from the order granting the motion for new trial.

## II.

### DISCUSSION

#### A. *The Fischers' Appeal*

##### 1. *Standard of Review*

Under Code of Civil Procedure section 437c, subdivision (c), summary judgment is proper where the papers submitted establish that no triable issues of material fact exist and that the moving party is entitled to judgment as a matter of law. ■ "On appeal, the reviewing court exercises its independent judgment, deciding whether the moving party established undisputed facts that negate the opposing party's claim or state a complete defense." (*Romano v. Rockwell Internat., Inc.* (1996) 14 Cal.4th 479, 486-487 [59 Cal.Rptr.2d 20, 926 P.2d 1114]; see also *Regents of University of California v. Superior Court* (1999) 20 Cal.4th 509, 531 [85 Cal.Rptr.2d 257, 976 P.2d 808].)

■ In the absence of conflicting parol evidence, the interpretation of a written contract is essentially a judicial function subject to independent review on appeal. (*Culligan v. State Comp. Ins. Fund* (2000) 81 Cal.App.4th 429, 434 [96 Cal.Rptr.2d 656].) A trial court's threshold determination as to whether there is an ambiguity permitting the admission of parol evidence is also a question of law subject to independent review. (*Appleton v. Waessil* (1994) 27 Cal.App.4th 551, 554-555 [32 Cal.Rptr.2d 676].) If parol evidence is admissible, and the competent parol evidence is in conflict, the construction of the contract becomes a question of fact. However, if the parol evidence is not conflicting, the appellate court will independently construe the writing. (*Winet v. Price* (1992) 4 Cal.App.4th 1159, 1165-1166 [6 Cal.Rptr.2d 554].)

##### 2. *There Is a Triable Issue of Fact Whether the Parties Mutually Agreed to Cross-collateralization of the Loans*

■ The trial court found that the dragnet clause contained in the deed of trust defeated all of the Fischers' causes of action as a matter of law. Finding no ambiguity as to the parties' intent regarding collateralization of the loans, the court applied the literal language of the dragnet clause and concluded that the bank had a right to apply the proceeds from the sale of the Fischers' residence to both loans. We disagree with the trial court's conclusion and find that there are triable issues of fact regarding whether the parties mutually agreed to cross-collateralization of the loans.

 A "dragnet" clause (also known as an "anaconda" clause) is a clause stating that a mortgage secures all the debts that the mortgagor may at any time owe to the mortgagee. California courts have upheld the general validity of dragnet provisions. (*Union Bank v. Wendland* (1976) 54 Cal.App.3d 393, 398 [126 Cal.Rptr. 549], citing cases.) However, they have also recognized the risk that such provisions may be included in a trust deed or mortgage without the debtor's knowledge or understanding. "Clauses such as this are often termed 'dragnet' or 'anaconda,' 'as by their broad and general terms they enwrap the unsuspecting debtor in the folds of indebtedness embraced and secured in the mortgage *which he did not contemplate . . . .' . . .*" (*Wong v. Beneficial Sav. & Loan Assn.* (1976) 56 Cal.App.3d 286, 292 [128 Cal.Rptr. 338], citations omitted.) "[B]ecause their apparent coverage is so broad, and because the mortgagor is often unaware of their presence or implications, the courts tend to construe [dragnet clauses] narrowly against the mortgagee." (2 Nelson & Whitman, Real Estate Finance Law (4th ed. 2002) p. 229; accord, Rest.3d Property, Mortgages (1997) § 2.4, p. 89.)

Courts in different jurisdictions have adopted widely varying approaches to broadly worded dragnet clauses that purport to apply to all existing and future debts and obligations. (See generally Annot., Debts Included in Provision of Mortgage Purporting to Cover All Future and Existing Debts (Dragnet Clause)—Modern Status (1981) 3 A.L.R.4th 690.) In many states, a dragnet clause will not be applied to other existing debts unless such debts are explicitly described in the security agreement. (*Wong v. Beneficial Sav. & Loan Assn., supra,* 56 Cal.App.3d at p. 293, citing non-California cases.) In those states, a generally worded dragnet clause that purports to cover all existing debts, but does not explicitly identify the debts covered, is insufficient as a matter of law to cover such debts.[1] (See, e.g., *Lundgren v. National Bank of Alaska* (Alaska 1987) 756 P.2d 270, 277-279.)

At the opposite extreme are courts that view the literal language of a generally worded dragnet clause as conclusive evidence of the intent of the parties that the clause encompass all other debts. (See, e.g., *Hamlin v. Timberlake Grocery Co.* (1974) 130 Ga.App. 648 [204 S.E.2d 442, 444-445].) The courts in these cases reason that the parties could have limited the

---

[1] The Restatement Third of Property adopts this approach: "A dragnet clause can have only a prospective effect. Even if the clause refers in general terms to preexisting indebtedness, the mortgage will not secure that indebtedness. . . . The reason for this limitation is that, if the parties wish to secure preexisting indebtedness, it is a simple matter for them to make specific reference to that debt in the mortgage or in a concurrent agreement. When this is not done, it is reasonable to assume that the parties did not focus their negotiations on the preexisting debt, and did not intend to make the mortgage secure it. On the other hand, a mortgage may secure preexisting indebtedness if it specifically identifies that debt." (Rest.3d Property, Mortgages, *supra,* § 2.4, com. b. p. 90.)

scope of the dragnet clause if that was their true intent, and conclude that the courts " 'will not do for a party that which he failed to do for himself.' [Citation.]" (*Clovis Nat. Bank v. Harmon* (1984) 102 N.M. 166 [692 P.2d 1315, 1318].)

In a number of jurisdictions, courts have adopted an approach somewhere between these two extremes. These courts examine a variety of factors to determine whether the parties intended the dragnet clause to apply to existing debts. However, they do not regard the literal language of a broad dragnet clause as constituting controlling evidence of the parties' intent. Some of these courts regard a boilerplate dragnet clause that does not specifically list other debts as being "ambiguous as to whether the antecedent debt is secured by the agreement." (*Wallace v. United Mississippi Bank* (Miss. 1998) 726 So.2d 578, 586-587.) The factors these courts consider in assessing the intent of the parties include: (1) whether the dragnet clause is boilerplate; (2) whether the other debts are of the same kind as the primary debt; (3) whether the other loans are listed in the dragnet clause; and (4) whether the debt which the lender seeks to have included in the dragnet clause is otherwise fully secured. (*Ibid.*)

■ California courts have taken an intermediate position with regard to the validity of dragnet clauses. The courts have rejected the view that a broadly worded dragnet clause may *never* be applied to other existing or contemporaneous debts. However, California courts have consistently adhered to a construction of such clauses that depends more on "the actual expectations of the parties . . . than the literal wording of the boilerplate clause." (*Ostayan v. Serrano Reconveyance Co.* (2000) 77 Cal.App.4th 1411, 1421 [92 Cal.Rptr.2d 577], citing *Union Bank v. Wedland, supra,* 54 Cal.App.3d at p. 404; accord, *Wong v. Beneficial Sav. & Loan Assn., supra,* 56 Cal.App.3d at p. 293.)

Because a dragnet clause is one of the provisions "least likely" to be understood by a layperson reading the fine print of a deed of trust, California limits the enforcement of such a provision "to those transactions where objective evidence discloses the intention of the *debtor and the creditor* to enlarge the lien to include other obligations." (4 Miller & Starr, Cal. Real Estate (3d ed. 2000) § 10.12, com., pp. 50-51.) The proponent of a dragnet clause bears the burden of establishing that the parties intended all existing or contemporaneous loans to be included within its scope. (*Wong v. Beneficial Sav. & Loan Assn., supra,* 56 Cal.App.3d at p. 294; Bernhardt, Cal. Mortgage and Deed of Trust Practice (Cont.Ed.Bar 3d ed. 2000) § 9.61, p. 683.)

A trust deed containing a dragnet clause that is printed on a standard bank form is considered a contract of adhesion under California law. (*Lomanto v.*

*Bank of America* (1972) 22 Cal.App.3d 663, 668 [99 Cal.Rptr. 442]; see also *Kirk v. Source One Mortgage Services Corp.* (1996) 46 Cal.App.4th 483, 491 [54 Cal.Rptr.2d 358] [standardized deeds of trust are contracts of adhesion].) Although contracts of adhesion are generally enforceable according to their terms, a provision contained in such a contract cannot be enforced if it does not fall within the reasonable expectations of the weaker or "adhering" party. (*Armendariz v. Foundation Health Psychcare Services, Inc.* (2000) 24 Cal.4th 83, 113 [99 Cal.Rptr.2d 745, 6 P.3d 669]; *Graham v. Scissor-Tail, Inc.* (1981) 28 Cal.3d 807, 819-820 [171 Cal.Rptr. 604, 623 P.2d 165]; see also Rest.2d Contracts, § 211(3) ["Where the other party has reason to believe that the party manifesting such assent would not do so if he knew that the writing contained a particular term, the term is not part of the agreement"].)

California courts have examined a number of factors in determining whether a broadly worded dragnet clause was mutually intended by the parties to cover preexisting or contemporaneous debts. Some of the relevant factors articulated in the case law include: (1) the language and specificity of the dragnet clause; (2) whether the parties were aware of the dragnet clause and appreciated its significance; (3) whether the other loans were of the same type or character as the primary loan; and (4) whether the bank relied upon the dragnet clause as the security for the other loans.[2] (*Wong v. Beneficial Sav. & Loan Assn., supra,* 56 Cal.App.3d at pp. 294-297; *Gates v. Crocker-Anglo Nat. Bank* (1968) 257 Cal.App.2d 857, 859-861 [65 Cal.Rptr. 536].)

Applying these general principles, we do not find an objectively clear and unambiguous expression of mutual intent to cross-collateralize Loan #1 and Loan #2. Preliminarily, the presence of the dragnet provision would have been discernable to a borrower only by cross-referencing from the highlighted security provision to the fine print of a 177-word, two-part definition of the word "indebtedness" filled with legal jargon that would have been incomprehensible to the average layperson. The first part of the definition of "indebtedness" expressly referred only to the $325,000 note for

---

[2]One commentator has suggested that parol evidence is generally admissible in California to show what debts a broadly worded dragnet clause was intended to cover. (Bernhardt, Cal. Mortgage and Deed of Trust Practice, *supra,* § 9.61, at pp. 682-683, citing *Anglo-Californian Bank v. Cerf* (1905) 147 Cal. 384, 387-388 [81 P. 1077] [holding parol evidence admissible to show that a deed absolute on its face was intended to secure future and existing indebtedness].) This approach would be consistent with the view that the presence of a broadly worded dragnet clause renders "ambiguous" the parties' intent regarding whether or not the clause is intended to cover existing debts that could have been described with specificity but were not. (*Wallace v. United Mississippi Bank, supra,* 726 So.2d at 586-587.) Parol evidence is admissible to resolve an ambiguity in a written contract. (Code Civ. Proc., § 1856, subd. (g).) Because we find the related loan documents to be ambiguous for other reasons, we need not consider whether parol evidence is more generally admissible to determine the intended scope of a broadly worded dragnet clause.

Loan #2. Yet, the second part purported to make the deed act as security for all other "obligations, debts and liabilities" in language so sweeping that it encompassed even debts "barred by any statute of limitations" or "otherwise unenforceable."

We find it significant that the deed of trust for the Fischers' residence expressly referred to the note for Loan #2, but never even mentioned Loan #1. ██ "Because it is easy to include specific existing obligations when that is the parties' intent, failure to do so permits the court to infer that no such intent existed or that, if it did, it was a secret intent harbored by the creditor and not shared with the debtor." (Bernhardt, Cal. Mortgage and Deed of Trust Practice, *supra*, § 9.61, at p. 682; cf. *Hess v. Ford Motor Co.* (2002) 27 Cal.4th 516, 527 [117 Cal.Rptr.2d 220, 41 P.3d 46] [finding that release applicable to all "persons, firms, corporations, associations or partnerships" may not have been intended to release Ford Motor Company because the release did not "specifically name Ford."].) ██ The fact that Loan #1 was fully and separately secured by the Fischers' business further supports an inference that the parties did not mutually intend cross-collateralization. (*Wong v. Beneficial Sav. & Loan Assn., supra,* 56 Cal.App.3d at p. 296.) The patently overinclusive language of the dragnet clause also suggests that it was not within the actual expectations of the parties. For example, we sincerely doubt that anyone would knowingly post his residence as collateral for "unenforceable" obligations, debts, and liabilities.

Other than the boilerplate language of the dragnet clause, the only factor supporting a contrary inference is that the loans were related to each other in kind and purpose. (*Wong v. Beneficial Sav. & Loan Assn., supra,* 56 Cal.App.3d at p. 295.) However, this factor does not carry great weight in light of the fact that each loan was separately secured as part of a single transaction. If the parties had intended the loans to be cross-collateralized, it would have been a simple matter for the bank to draw up the loan documents for each loan so that they referred specifically to the other.

The most critical factor in our decision is the fact that the deed of trust expressly incorporated by reference all other "Related Documents" into the overall agreement. The deed broadly defined "Related Documents" to "include without limitation all . . . loan agreements . . . and all other instruments, agreements and documents, whether now or hereafter existing, executed in connection with the Indebtedness."

The September Agreement falls squarely within this definition of a "Related Document." This agreement was executed by the Fischers and the bank in connection with the loan secured by the trust deed. It constituted an

agreement between the parties that encompassed all of the material elements necessary to constitute a binding loan commitment—"the identity of the lender and borrower, the amount of the loan, and the terms for repayment." (*Peterson Development Co. v. Torrey Pines Bank* (1991) 233 Cal.App.3d 103, 115 [284 Cal.Rptr. 367].) A written loan commitment by a lender that contains these essential terms "is a binding and enforceable obligation of the lender, subject to the conditions precedent expressed in the commitment." (12 Miller & Starr, Cal. Real Estate (3d ed. 2001) § 36.4, pp. 10-11.) Thus, we conclude that the September Agreement was one of the "Related Documents" expressly incorporated by reference into the deed of trust.

In contrast to the deed of trust, the September Agreement did not include a dragnet provision that would have permitted cross-collateralization of the two loans. Significantly, the agreement was not silent on the subject of collateral; it specifically identified the collateral for each of the two loans and expressly stated that the business would serve as collateral for both loans, but that the Blue Sage residence would serve as collateral for Loan #2 only. Cross-collateralization was not a condition of either of the loans according to the terms of the September Agreement.

■ As with any contract, the September Agreement must be construed according to the "ordinary and popular" meaning of its language. (Civ. Code, § 1644.) "Thus, if the meaning a layperson would ascribe to contract language is not ambiguous, we apply that meaning." (*AIU Ins. Co. v. Superior Court* (1990) 51 Cal.3d 807, 822 [274 Cal.Rptr. 820, 799 P.2d 1253].) ■ Because the September Agreement specifically addressed the subject of collateral and did not mention cross-collateralization, we believe that any layperson reading its plain language would have understood it to mean exactly what it said: that the Blue Sage residence would serve as collateral for Loan #2, but not Loan #1. The clear terms of the September Agreement would have precluded the bank from using the residence as collateral for Loan #1.

■ "Under the rule of strict construction, any ambiguity between a 'dragnet' provision and another provision covering the same subject matter would have to be construed against application of the dragnet clause, absent other evidence of the parties' intentions." (*Farmers & Mechanics Bank v. Davies* (1981) 97 Ill.App.3d 195 [52 Ill.Dec 655, 422 N.E.2d 864, 868].) Each of the related documents must be considered together as part of the whole agreement (Civ. Code, § 1642), resolving any uncertainty in their overall meaning against the bank as the drafter of the documents. (Civ. Code, § 1654.)

■ Mindful of the general rule that "the actual expectations of the parties" are more important than the "literal wording of the boilerplate

[dragnet] clause" (*Ostayan v. Serrano Reconveyance Co., supra,* 77 Cal.App.4th at p. 1421), we therefore conclude that the conflicting provisions of the September Agreement and the deed of trust create a triable issue of fact regarding the true intentions of the parties. At a minimum, the loan agreement creates ambiguity as to whether the parties mutually intended to permit cross-collateralization. Parol evidence is admissible to resolve this ambiguity. (Code Civ. Proc., § 1856, subd. (g); 2 Witkin, Cal. Evidence (4th ed. 2000) Documentary Evidence, §§ 74-75, pp. 192-195.) Parol evidence is also admissible regarding whether the dragnet clause was within the "reasonable expectations" of the Fischers when they signed the trust deed. (*Graham v. Scissor-Tail, Inc., supra,* 28 Cal.3d at p. 819.)

The parol evidence presented by the Fischers in the trial court, if believed by the trier of fact, would support a finding that the parties did not mutually intend that the loans be cross-collateralized. According to the Fischers, the bank represented to them at virtually every step of the way that their home would not serve as collateral for Loan #1. The bank assured them that the terms of the September Agreement would prevail over the technical language of the other loan documents, and that any equity from a sale of their home would be used to pay off the balance of Loan #2 only. If these factual issues are resolved in the Fischers' favor, the trier of fact could find that the bank breached its contract with the Fischers by applying the $125,000 net proceeds from the sale of their residence to Loan #1.

The bank's other arguments as to the remaining causes of action are premised upon its claim that the dragnet clause unambiguously authorized FIB to apply the net proceeds of the sale to Loan #1. First, the bank argues that the claims of fraud in the inducement, negligent misrepresentation, and false promise are barred in their entirety by the parol evidence rule, asserting that the alleged promises and misrepresentations are directly at variance with the unambiguous language of the dragnet clause. (See *Bank of America etc. Assn. v. Pendergrass* (1935) 4 Cal.2d 258, 263 [48 P.2d 659].) Second, the bank argues that the Fischers cannot claim justifiable reliance as a matter of law, again claiming that the alleged misrepresentations contradict the plain meaning of the dragnet clause. (See *Marketing West, Inc. v. Sanyo Fisher (USA) Corp.* (1992) 6 Cal.App.4th 603, 611 [7 Cal.Rptr.2d 859].) Third, the bank argues that the claims for conversion and breach of the covenant of good faith and fair dealing are invalid because they are based on conduct by FIB that was expressly authorized by the dragnet clause. (See *Carma Developers (Cal.), Inc. v. Marathon Development California, Inc.* (1992) 2 Cal.4th 342, 374 [6 Cal.Rptr.2d 467, 826 P.2d 710].)

These arguments are all defeated by our finding that the relevant documents are ambiguous as to whether the parties mutually intended to permit

cross-collateralization of the loans. Because we find that there are triable issues of fact as to the intent of the parties on this issue, we cannot resolve any of the claims as a matter of law on the grounds urged by the bank. The sole basis for the trial court's summary judgment ruling was its finding that the dragnet clause unambiguously gave the bank the right to apply the proceeds of the sale of the Fischer's residence to Loan #1. For the reasons discussed, we reject the trial court's conclusion on this dispositive issue. Accordingly, we must reverse the judgment in the bank's favor.[3]

### B. *The Escrow Company's Appeal*

#### 1. *The Trial Court Lacked Jurisdiction to Grant the Motion for New Trial*

 The escrow company, ITC, appeals from the trial court's order granting a new trial by application of the "tort of another" doctrine. ITC first contends that the trial court lacked jurisdiction to grant the motion because it failed to act within the statutory 60-day period after the Fischers gave notice of their intention to move for a new trial. (Code Civ. Proc., § 660.) Because we find this jurisdictional claim to be dispositive, we need not address ITC's other contentions.

Code of Civil Procedure section 660 provides in relevant part: "[T]he power of the court to rule on a motion for a new trial shall expire 60 days from and after the mailing of notice of entry of judgment by the clerk of the court . . . or 60 days from and after service on the moving party by any party of written notice of the entry of the judgment, whichever is earlier, *or if such notice has not theretofore been given, then 60 days after filing of the first notice of intention to move for a new trial.* If such motion is not determined within said period of 60 days, or within said period as thus extended, the effect shall be a denial of the motion without further order of the court." (Italics added.)

"The 60-day time limit of C.C.P. 660 is jurisdictional, and cannot be evaded by stipulation or *nunc pro tunc* order." (8 Witkin, Cal. Procedure (4th

---

[3]We also note that, even assuming the loans were cross-collateralized, the record does not establish that the bank ever exercised its option under the due-on-sale clause to "declare immediately due and payable" the balance of Loan #1. A due-on-sale clause merely gives the lender the option of accelerating the debt and demanding payment of the unpaid balance, and the right to accelerate can be waived. (4 Miller & Starr, Cal. Real Estate (3d ed. 2000) §§ 10:104, 10:106, 10:110, pp. 297, 304-305, 320-321.) There would have been a default on Loan #1 only if the bank had made a timely election to accelerate the debt and the Fischers had failed to pay the remaining balance after notice of the election. (*Id.*, § 10:140, p. 408.) Further, the bank's remedy for such a default would have been to foreclose on the loan. (*Id.*, § 10:135, pp. 394-395.) Thus, even if we were to assume that the loans in this case were cross-collateralized, it would be doubtful whether the bank had any right to apply the proceeds of the sale to the balance of Loan #1. However, we need not resolve these questions definitively, as they have not been raised in the appeal.

ed. 1997) Attack on Judgment In Trial Court, § 78, p. 579.) In cases such as this, where there has been no notice of entry of judgment, "section 660 unambiguously provides that the filing of the first notice of intention to move for a new trial is the operative event for determining the 60-day period . . . ." (*In re Marriage of Liu* (1987) 197 Cal.App.3d 143, 151 [242 Cal.Rptr. 649].) Thus, an order granting a motion for new trial more than 60 days after the filing of a notice of intention to move for new trial is void for lack of jurisdiction. (*Id.* at pp. 150-151; *Bunton v. Arizona Pacific Tanklines* (1983) 141 Cal.App.3d 210, 214-217 [190 Cal.Rptr. 295].)

In this case, the Fischers filed and served their notice of motion and motion for new trial on January 14, 2002. The court issued a tentative ruling granting the motion on February 22, 2002. On March 29, 2002, after hearing oral argument, the court issued a final written decision confirming the tentative ruling. The court's final order granting the motion for new trial was entered 74 days after the Fischers filed their notice of motion and motion for new trial. Because the order was entered beyond the 60-day jurisdictional period, it is void for lack of jurisdiction. We must therefore reverse the order granting the motion for new trial.

We note that the rationale of the trial court's original order granting summary judgment to ITC has been undermined by our disposition of the Fischers' appeal.[4] The sole basis for the trial court's order granting summary judgment in favor of ITC was its finding that the bank was entitled to receive the net proceeds from the sale of the Fischers' residence as a matter of law. Because we reject this reasoning and find that triable issues of fact exist on this issue, the trial court's summary judgment order cannot stand.

The trial court never entered any final judgment with respect to ITC and thus retains inherent authority to reconsider, correct, and change its interim orders. (See *Kerns v. CSE Ins. Group* (2003) 106 Cal.App.4th 368, 385-391 [130 Cal.Rptr.2d 754] [citing and following cases holding that trial courts have inherent constitutional power to reconsider, correct, and change their own interim decisions sua sponte before entry of final judgment].) Accordingly, we direct the trial court on remand to exercise its inherent constitutional authority to reconsider the summary judgment order in favor of ITC.

DISPOSITION

The judgment in favor of FIB is reversed. The order granting a new trial as to ITC is reversed and remanded with directions to the trial court to

---

[4]The Fischers have appealed only from the judgment entered in FIB's favor. No final judgment was ever entered in favor of ITC and the original order granting summary judgment in favor of ITC was not appealable in the absence of a final judgment. (6 Witkin, Cal. Procedure (4th ed. 1997) Proceedings Without Trial, § 233, p. 643.)

exercise its inherent authority to reconsider the summary judgment order in favor of ITC. Plaintiffs are entitled to costs on appeal.

Benke, Acting P. J., and McDonald, J., concurred.