Filed 2/26/13  Insurance Co. of the West v. Engineered Systems and Construction CA4/1

# NOT TO BE PUBLISHED IN OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

## COURT OF APPEAL, FOURTH APPELLATE DISTRICT

## DIVISION ONE

## STATE OF CALIFORNIA

| | |
|---|---|
| INSURANCE COMPANY OF THE WEST,<br><br>      Plaintiff, Cross-defendant and Respondent,<br><br>      v.<br><br>ENGINEERED SYSTEMS AND CONSTRUCTION, INC.,<br><br>      Defendants, Cross-complainants and Appellants. | D059661<br><br><br>(Super. Ct. No. 37-2008-00088812-CU-BC-CTL) |

APPEAL from a judgment of the Superior Court of San Diego County, Joel Pressman, Judge.  Reversed.

A public entity typically requires a successful bidding contractor to obtain a performance bond to ensure the work will be fully performed.  To obtain this bond, the contractor must generally enter into an indemnity contract with a surety in which the surety agrees to issue the bond and guaranty the performance.  In exchange, the contractor agrees to indemnify (repay) the surety for any payments made by the surety to

the public entity on a claim. Under the indemnity contract, a surety is not the contractor's insurer, but rather acts as a guarantor with rights against the contractor if the surety pays on a claim brought by the public entity.

In this case, a public entity brought claims against a contractor for claimed deficiencies in the work and against the contractor's surety to enforce a performance bond. The surety settled this claim for $250,000 and then sued the contractor and others who had signed a March 2006 indemnity agreement. As amended, the complaint alleged these defendants breached the indemnity agreement by refusing to indemnify the surety for the $250,000 settlement payment and for the attorney fees and costs incurred in the underlying action. The contractor (and the other defendants) filed a cross-complaint, seeking declaratory relief that no valid indemnity contract existed and various other forms of relief pertaining to a deed of trust.

The surety moved for summary judgment on the complaint and cross-complaint. The court granted the motion, and entered a judgment in the surety's favor for $250,000. The court also stated the surety would be entitled to move for its attorney fees and costs incurred in the underlying action in a postjudgment motion.

The contractor and related parties appeal, contending disputed factual issues exist as to whether there was a valid indemnity agreement governing the performance bond at issue and whether the $250,000 was a reasonable settlement. We conclude the court erred in granting summary judgment on the complaint and cross-complaint. Specifically, we determine there are triable issues of fact regarding the reasonableness of the $250,000 settlement and the reasonableness of the fees incurred by the surety in the litigation on

the underlying bond.  For guidance on remand, we also discuss appellants' argument that they are not bound to indemnify the surety because there was no valid applicable indemnity agreement between the parties.

FACTUAL AND PROCEDURAL SUMMARY

Plaintiff Insurance Company of the West (ICW) is a licensed surety that issues payment and performance bonds to guarantee the performance of construction contracts. Defendant Engineered Systems and Construction, Inc. (Engineered Systems) is a contractor that installs water treatment facilities for public entities.  At the relevant times, Engineered Systems was owned by defendants Donald and Mary Howard and another married couple.[1]  Donald Howard was Engineered Systems' president.

In January 1996, ICW and Engineered Systems entered into a general indemnity agreement, which was also signed by the Howards as individuals.  In the agreement, Engineered Systems and the Howards agreed to indemnify ICW for all liability, including attorney fees and costs, "by reason of" the surety issuing bonds in favor of Engineered Systems.  The agreement further provided that ICW was entitled to recover amounts paid in settlement of claims asserted against Engineered Systems "whether or not such liability actually existed" *if* the payments were made "in the reasonable belief that [Engineered Systems] was liable for the amount paid or that it was expedient under all the

---

[1]    Because this other couple is not part of the appeal, we omit further mention of them in the opinion.

3

circumstances to make such payment or compromise . . . ."[2]

During the next eight years, Engineered Systems and ICW developed a close working relationship in which ICW would provide performance bonds for public works projects awarded to Engineered Systems, and Engineered Systems recognized its obligation to repay ICW for any amounts paid on claims related to the bonded projects.

In 2004, Engineered Systems entered into a contract with the Rainbow Municipal Water District (Rainbow) in which Engineered Systems agreed to install a water disinfection system to be used for outdoor reservoirs. Rainbow agreed to pay Engineered Systems $1,003,152 for the work. On Engineered Systems' behalf, ICW issued a $1,003,152 performance bond which guaranteed Engineered Systems' performance of its contractual obligations. The bond stated that ICW's obligation "shall continue so long as any obligation of [Engineered Systems] remains."

_____

[2]     The indemnity provision reads in relevant part: "1. INDEMNITY. The Undersigned shall indemnify and keep indemnified the Surety against any and all liability for losses and expenses of whatsoever kind or nature, including attorney fees and costs, by reason of having executed or procured the execution of Bonds, or by reason of the failure of the Principal or Indemnitors to perform or comply with the covenants and conditions of this Agreement. [¶] The Surety may pay or compromise any claim, demand, suit, judgment, or expense arising out of the Bonds, and any such payment or compromise made by the Surety in the reasonable belief that it was liable for the amount paid or that it was expedient under all the circumstances to make such payment or compromise, shall be binding upon the Undersigned as a loss or expense covered by this indemnity, whether or not such liability actually existed. An itemized statement of the payment or compromise, sworn to by an officer of the Surety, or the voucher or vouchers or other evidence of the payment or compromise, shall be prima facie evidence of the fact and the amount of the liability of the Undersigned under this Agreement."

Two years later, Engineered Systems was the successful bidder on a large project known as the Sierra Madre project. Because of the project size, ICW conditioned the issuance of a performance bond on the Howards' agreement to provide additional collateral in the form of a trust deed on the Howards' home and enter into another indemnity agreement that provided for such additional collateral. The Howards agreed to execute the deed of trust and in March 2006, the parties entered into this new indemnity agreement. The agreement was signed by ICW, Engineered Systems, and the Howards (individually, and as trustees of their living trust, and on behalf of the Howards' related business entity (Donald R. Howard Consulting Engineers, Inc.)).

The March 2006 indemnity agreement was *identical* to the 1996 indemnity agreement in all respects (including the indemnity provision set forth in footnote 2 above), except the agreement contained one new paragraph relating to the additional collateral and one paragraph identifying additional related parties who could be held liable to ICW for payments made on a bond. As did the earlier agreement, the March 2006 indemnity agreement also contained an integration clause: "This Agreement contains the entire agreement of the parties and supersedes any prior or contemporaneous written or oral agreements, representations and warranties between the parties with respect to the subject matter of this Agreement. There are no representations, warranties, agreements, arrangements, or understandings, written or oral, that are not fully expressed in the Agreement."

In 2007, Engineered Systems completed the Sierra Madre project.

5

On April 3, 2008, Rainbow served ICW with its complaint against ICW, Engineered Systems, and other parties involved in the manufacture/installation of Rainbow's water disinfection system. As against Engineered Systems, Rainbow alleged breach of contract, fraud, negligent misrepresentation, and a statutory claim. As against ICW, Rainbow alleged it incurred damages in excess of $2.5 million to repair Engineered Systems' defective and deficient work, and thus was entitled to recover these damages under ICW's bond.

The same day, ICW sent a letter to Engineered Systems requesting that Engineered Systems answer for and hold harmless ICW from all losses, costs, and expenses to be incurred in the defense to the action brought by Rainbow. Engineered Systems did not receive the letter for another six weeks until about May 12, 2008. Two months later, in July 2008, ICW filed a complaint against Engineered Systems and the other Howard parties who signed the March 2006 indemnity agreement, seeking defense and indemnification regarding the Rainbow lawsuit.

The next month, on August 7, Donald Howard met with ICW representatives during which the ICW representatives demanded that Engineered Systems post security in the amount of $1.25 million to protect ICW from the anticipated losses resulting from Rainbow's lawsuit. This request was made under a contractual provision (contained in both the 2006 and 1996 indemnity agreements) requiring an indemnitor to provide a security deposit "[i]f the Undersigned desire a claim against the Surety to be resisted"

(the defense deposit provision).[3] Howard refused to post any security, but offered to provide ICW with legal counsel and bear the full costs of counsel through Engineered Systems' insurer. ICW rejected this offer, stating that ICW did not believe Engineered Systems' counsel had sufficient expertise to properly defend the claims and that ICW had no obligation to accept counsel if Engineered Systems refused to post the requested $1.25 million in security while the Rainbow action was pending.

During the next year, ICW undertook the defense of Rainbow's claims. In November or December 2009, ICW settled the Rainbow lawsuit and paid Rainbow $250,000. At the time, ICW had allegedly incurred $433,110.64 in costs and attorney fees relating to the Rainbow litigation.

In ICW's second amended complaint, ICW alleged claims against each of the parties that had signed the March 2006 indemnity agreement (collectively defendants[4]), seeking to recover amounts incurred in the Rainbow lawsuit. ICW alleged several legal

---

[3]     This provision states: "If the Undersigned desire a claim against the Surety to be resisted, the Undersigned shall (a) make written request to the Surety to defend against the claim including a statement of the basis for the defense, (b) simultaneously deposit with the Surety cash or collateral acceptable to the Surety in kind and amount, sufficient to cover the claim and any costs, interest, attorney fees, sanctions or other costs that may be awarded in any judgment or otherwise, and (c) either simultaneously deposit cash or collateral satisfactory to the Surety in an amount sufficient to cover the expenses and attorney fees of defending against the claim or provide and pay the fees and expenses of counsel acceptable to the Surety to conduct the defense."

[4]     These defendants were Engineered Systems and the Howards, individually and on behalf of their living trust and their wholly-owned business.

theories, including breach of contract and statutory reimbursement under Civil Code section 2847.

Defendants filed a cross-complaint. In the first cause of action, defendants sought a declaration that: (1) ICW had no contractual rights against defendants because the March 2006 indemnity agreement related only to the Sierra Madre project and the 1996 indemnity agreement had been extinguished by the execution of the March 2006 indemnity agreement; and (2) ICW's claims had no merit because it rejected Engineered Systems' offer of a defense.[5] The remaining causes of action concerned defendants' challenges to the continuing validity of the Sierra Madre deed of trust encumbering the Howards' residence.

After unsuccessfully demurring to the amended cross-complaint and withdrawing a petition for writ of attachment relating to the deed of trust, ICW moved for summary judgment and/or summary adjudication on the complaint and cross-complaint. ICW argued the undisputed facts showed it fulfilled all of its obligations under the March 2006 indemnity agreement, defendants breached the agreement by failing to reimburse it for the settlement payment and litigation costs/fees, and it sustained damages of $683,110.64 (the $250,000 settlement amount plus the $433,110.64 in claimed costs and attorney fees). In response to defendants' claims that there was no valid indemnity agreement concerning the Rainbow project, ICW argued the plain language of the March 2006

---

[5] Defendants also sought declaratory relief related to their allegation that the March 2006 indemnity agreement was procured by economic duress, but have since withdrawn that claim.

indemnity agreement shows it applies to all bonds issued on Engineered Systems' behalf before or after this agreement was signed, and that in any event, the 1996 agreement applies to the Rainbow bond.

To support the damages amount, ICW submitted several declarations, including from its surety claims vice president, its former claims consultant who met with Mr. Howard in August 2008, and its counsel who was involved in the underlying Rainbow action. As detailed below, these declarations were submitted to support ICW's claims regarding the amount and reasonableness of the $250,000 settlement and to set forth reasons explaining why ICW declined the Howards' offer to defend the Rainbow claims.

In opposition to ICW's motion, defendants argued there were disputed factual questions on the following issues: (1) whether the March 2006 indemnity agreement applies to the Rainbow bond; (2) whether the settlement ($250,000) and claimed attorney fees and costs ($433,110.64) were "grossly excessive," particularly in light of ICW's rejection of Engineered Systems' offer to provide a full defense; and (3) whether ICW's $1.25 million collateral request was excessive and unreasonable.

In support, defendants submitted Mr. Howard's declaration pertaining to the circumstances leading to the execution of the March 2006 indemnity agreement. Howard said that after Engineered Systems was awarded the Sierra Madre contract, ICW stated for the first time that because of the project size, it would not issue a performance bond on the project unless Engineered Systems (or its principals) provided additional collateral (in the form of a deed of trust on the Howards' residence) and agreed to enter into a new indemnity agreement. Howard said that before he signed the March 2006 indemnity

9

agreement, ICW managers Donald Roop and Judith Dickinson "assured me . . . that [the March 2006 indemnity agreement] specifically related to the Sierra Madre project. [¶] . . . They also stated that the deed of trust as well, related *only* to the Sierra Madre Project. And that upon satisfactory completion of the Sierra Madre Project that the deed of trust would be conveyed back to our Living Trust." Howard also said that the ICW representatives informed him that upon completing the Sierra Madre project, the March 2006 indemnity agreement would be "cancelled, and that the deed of trust would be conveyed back to us." Defendants also submitted a letter from ICW confirming that the *deed of trust* was for the purpose of securing the Sierra Madre final bond.

With respect to the issue of the reasonableness of the $250,000 settlement, Howard said Rainbow's lawsuit "consists largely of minor complaints . . . [that] totaled about $25,000 or less, and virtually all of them were corrected by us, all at no cost to Rainbow." Howard also asserted that Rainbow's claim that Engineered Systems was liable for the defective design of the system was "incorrect" because Engineered Systems was not involved in the design of the water treatment system.

Defendants also produced the declaration of Leonard Levy, an attorney with substantial training and experience in representing surety companies. Levy offered an opinion on the meaning of the defense deposit provision (see fn. 3, *ante*), stating the provision "relates to the circumstance when the bond principal desires that the *surety* defend the claim, *not* the circumstance existing in this matter, where the precise opposite circumstance exists, i.e. the bond principal and indemnitors offering to defend the surety, at no cost to the surety." Levy also said that "the standard practice in the industry is for

10

surety companies to avoid incurring expenses by tendering defense to the principal and/or indemnitors when claims and/or lawsuits are instituted against sureties. When a bond principal is being defended in an action by competent counsel, who are being paid, *and the bond principal has the apparent ability to satisfy any judgment rendered against the principal and surety*, it is the general practice in the industry to allow the principal to defend the surety . . . ." (Italics added.) Levy also opined that the insurance defense firm retained by Engineered Systems' insurer was competent and qualified to have represented ICW in the matter.

After holding a hearing and permitting supplemental briefing on the contract issues, the court granted summary judgment in ICW's favor on its complaint and on the cross-complaint. The court found the plain language of the March 2006 indemnity agreement applied to all bonds "whether issued prior to or after execution" of the indemnity agreement. The court also found the undisputed facts showed the reasonableness of the $250,000 settlement. In the final judgment, the court stated ICW was "entitled to judgment in the amount of $250,000 from Defendants, the amount paid by ICW to settle the claims made by [Rainbow] against bonds issued by ICW at the request of Defendants." With respect to the costs and attorney fees allegedly incurred by ICW in the underlying Rainbow action, the court indicated that ICW was entitled to reimbursement, but the amount of such fees and costs "shall be determined by way of a regularly-noticed, post-judgment motion to recover attorneys' fees and costs."

DISCUSSION

I. *Review Standards*

A summary judgment or summary adjudication motion shall be granted when there is no triable issue of material fact and the moving party is entitled to judgment as a matter of law. A plaintiff moving for summary judgment "bears the burden of persuasion that 'each element of' the 'cause of action' in question has been 'proved,' and hence that 'there is no defense' thereto." (*Aguilar v. Atlantic Richfield Co.* (2001) 25 Cal.4th 826, 850.) A moving plaintiff need not "disprove any defense asserted by the defendant"; instead "[a]ll that the plaintiff need do is to 'prove[ ] each element of the cause of action.' " (*Id.* at p. 853.) When a plaintiff has met this initial burden, the burden shifts to the defendant "to show that a triable issue of one or more material facts exists as to that cause of action or a defense thereto." (Code Civ. Proc., § 437c, subd. (p)(1).)

We review the trial court's ruling de novo, liberally construing the evidence in favor of the party opposing the motion and resolving all doubts in the opposing party's favor. (*Miller v. Department of Corrections* (2005) 36 Cal.4th 446, 460.) We will affirm a summary judgment or summary adjudication if it is correct on any ground that the parties had an adequate opportunity to address in the trial court, regardless of the trial court's stated reasons. (*California School of Culinary Arts v. Lujan* (2003) 112 Cal.App.4th 16, 22; see Code Civ. Proc., § 437c, subd. (m)(2).)

Under these principles, we review the summary judgment on ICW's complaint and defendants' cross-complaint.

## II. *ICW's Complaint*

The court granted summary judgment on ICW's complaint based on its breach of contract cause of action and awarded ICW $250,000.  Defendants contend the court erred because triable factual issues exist on whether: (1) the March 2006 indemnity agreement governed the Rainbow bond and thus entitled ICW to recover the $250,000; and (2) the $250,000 payment was a reasonable settlement amount in the Rainbow action.

As explained below, we determine the second argument has merit and this conclusion requires that we reverse the summary judgment.  If a cause of action is not proved in its entirety, the court cannot grant a plaintiff's summary judgment or summary adjudication motion.  (See *McCaskey v. California State Automobile Assn*. (2010) 189 Cal.App.4th 947, 975; *Catalano v. Superior Court* (2000) 82 Cal.App.4th 91, 95-97.) For guidance on remand, we additionally address defendants' first argument regarding the applicability of the March 2006 indemnity agreement.

### A.  *Reasonableness of $250,000 Settlement Payment*

In the March 2006 and the 1996 indemnity agreements, defendants agreed to indemnify ICW for any amounts paid by reason of issuing the bond.  (See fn. 2, *ante*.) Under the terms of these agreements, ICW's reimbursement right was not dependent on a showing that the payment was made under legal compulsion.  The indemnity agreement states that settlement amounts paid by ICW "in the reasonable belief that it was liable for the amount paid or that it was expedient under all the circumstances to make such payment or compromise, shall be *binding* upon the Undersigned as a loss or expense covered by this indemnity, *whether or not such liability actually existed*."  (Italics added.)

13

Additionally, "[a]n itemized statement of the payment or compromise, sworn to by an officer of the Surety . . . shall be prima facie evidence of the fact and the amount of the liability of the [indemnitor] . . . ."

To show a reimbursement right under these provisions, ICW presented the sworn declaration of its vice president stating that ICW paid $250,000 to settle the claims asserted by Rainbow. It also presented the declaration of its counsel (Jeffrey Robbins) explaining the decision to pay the $250,000 settlement in the Rainbow litigation. This declaration stated in relevant part:

> "ICW spent more than a year investigating and litigating the lawsuit brought by Rainbow. The case involved five separate parties, Rainbow, ICW, [Engineered Systems], the manufacturer of the chlorination system sold by [Engineered Systems] [Miox Corporation], and Rainbow's in-house engineer, Dudek & Associates. Thousands and thousands of documents were produced. Weeks worth of depositions were taken. Extensive written discovery was exchanged by all sides. ICW had to retain experts in the field of water chemistry and water storage systems. ICW brought its experts out to Southern California in order to inspect the outdoor reservoirs where Rainbow installed the chlorination system.
>
>  . . . In late December 2009, ICW ultimately made the decision to settle the Rainbow lawsuit, pay Rainbow the sum of $250,000 and stop incurring litigation costs and attorneys' fees. It was clear that [Engineered Systems] was at least partially responsible for some of the damages alleged by Rainbow. The manufacturer of the system [Engineered Systems] sold, Miox Corporation, settled its claim with Rainbow for $125,000. As far as I know, the only remaining defendants in Rainbow's lawsuit are Dudek & Associates and [Engineered Systems]. Had ICW not settled with Rainbow, it would have continued to accrue litigation costs for the past eight months, an amount which likely would have exceeded the $250,000 that [Engineered Systems] paid to settle Rainbow's claim. Given the exposure [Engineered Systems] has in the case and the existence of an attorney's fees provision in the Rainbow/[Engineered Systems] contract, it is conceivable, if not likely, that ICW would have paid

14

hundreds of thousands of additional attorneys' fees through trial only to face a judgment, even if for a relatively small amount, that would obligate ICW to pay Rainbow's attorneys' fees, which would easily run into the high six figures, if not seven."

ICW also relied on Rainbow's complaint alleging breach of contract, tort, and statutory claims against Engineered Systems. In the breach of contract cause of action, Rainbow alleged that Engineered Systems failed to properly install the water treatment system and failed to provide a proper engineered design for the system. Rainbow alleged that as a result of the breaches, Rainbow sustained damages including expenses to remedy the deficiencies in the installed systems and additional expenses to replace and monitor the system. Rainbow also sought its attorney fees under a contractual provision in the Rainbow-Engineered Systems contract.

This evidence satisfied ICW's summary judgment burden to show it was liable on the bond for $250,000 and that it was entitled to reimbursement of that amount. (*Fidelity & Deposit Co. v. Whitson* (1960) 187 Cal.App.2d 751, 757 [under similar indemnity provision "where there is no trial and no judgment establishing liability, but a settlement of the litigation has been made, the settlement becomes presumptive evidence of the [surety's] liability and the amount thereof, which presumption is subject to being overcome by proof"]; see *Travelers Casualty & Surety Co. of America v. Highland Partnership, Inc.* (S.D. Cal. 2012) 2012 WL 5928139; *General Ins. Co. of America v. Singleton* (1974) 40 Cal.App.3d 439, see also *Peter Culley & Associates v. Superior Court* (1992) 10 Cal.App.4th 1484, 1497.)

15

Thus, the burden shifted to defendants to submit evidence showing a triable issue of fact. To satisfy this burden, defendants relied primarily on the declaration of Engineered Systems' president (Howard), who indicated he had personal knowledge of the Rainbow contract work. He stated in relevant part:

> "I find [the $250,000 settlement] amount entirely unreasonable[.] [B]ased on my experience, [Engineered Systems] is not liable to Rainbow for the work we performed. [¶] . . . As I read Rainbow's main complaint in the action, it relates to its dissatisfaction with the disinfecting effect of the MIOX System. Rainbow's claim against [Engineered Systems] consists largely of minor complaints about installation problems that had to be fixed. These items, however, totaled about $25,000 or less, and virtually all of them were corrected by us, all at no cost to Rainbow. [¶] . . . Rainbow's taking the position that [Engineered Systems] was engaged in designing the project, rather than merely installing a water system and related specific equipment in accordance with the contract that was designed by Dudek (Rainbow's main target), and which was approved by Rainbow itself is incorrect. [¶] . . . The only design responsibility that we undertook was to design a concrete slab—this item is not in question, or alleged to be defective in any way. "

Liberally construing Howard's declaration, we conclude it was sufficient to create a triable issue of fact on whether ICW had a reasonable belief it was liable for the $250,000 or whether the settlement was "expedient" under all the circumstances. As Engineered Systems' president, Howard was familiar with the overall project, including his company's services as compared to the work performed by other contracting parties; Rainbow's complaints concerning Engineered Systems' work and the work of other contractors; and the repair work his company performed in response to these complaints. According to Howard, Rainbow's major complaint concerning the disinfecting effect of the MIOX system and the manner in which the system was designed resulted from other

16

contractors' work and the complaints about the installation work for which Engineered System was responsible were "largely . . . minor." Howard maintained the $250,000 settlement was "entirely unreasonable" because the cost to repair these problems was $25,000 or less and that Engineered Systems fixed these problems at virtually no cost to Rainbow. Assuming a trier of fact agreed with this assessment, it could also reasonably conclude a far less vigorous defense was warranted. This would minimize the attorney fees Engineered Systems might ultimately owe to Rainbow—a primary factor relied upon by ICW to justify the $250,000 settlement. Howard's declaration was sufficient to create a triable issue of fact.

Surety expert Levy's opinion that ICW acted below the standard of care in refusing to accept Engineered Systems' insurance defense counsel to represent its interests in the Rainbow litigation is consistent with this conclusion. Levy indicated that insurance defense counsel was qualified and experienced in handling construction disputes with the ability to properly evaluate Engineered Systems' exposure and to implement a litigation strategy commensurate with that exposure. Although ICW declarations explaining the reasons for the expenses associated with its defense of the underlying case appear reasonable, if a jury were to conclude that Engineered Systems' exposure was in line with Howard's assessment of the minor role it played, the jury could conclude that a far less vigorous defense was warranted and thus minimize any attorney fees Engineered Systems might ultimately owe to Rainbow. Because ICW considered the exposure to these fees as an important factor in justifying the settlement, this too, could impact whether the $250,000 settlement was reasonable.

Additionally, the court erred in granting summary judgment because ICW sought attorney fees incurred in its Rainbow litigation defense as part of ICW's breach of contract claim, and the final judgment stated that ICW was entitled to those fees and would have the opportunity to prove them in postjudgment proceedings. However, because ICW did not present any foundational evidence supporting the amount or reasonableness of these attorney fees, the court erred in granting summary judgment on this claim. The court further erred because it deferred the determination of the amount of the fees to a postjudgment proceeding. This ruling was erroneous because the amount of attorney fees incurred in the Rainbow action is a damages issue and not a matter that could be decided in a postjudgment proceeding. On remand, ICW will be entitled to seek these fees, but its entitlement to these fees will depend on its proof of its substantive claims in the trial proceedings and not in postjudgment proceedings.

B. *Does the March 2006 Indemnity Agreement Govern ICW's Reimbursement Claim?*

In their appellate briefs, defendants contend the court also erred in granting summary judgment because the March 2006 indemnity agreement applied *only* to future bonds and/or that there is a factual dispute on this issue. Based on our conclusion that triable factual issues exist on the reasonableness of the settlement amount, we need not reach the issue. Summary judgment cannot be granted if any factual issues exist with regard to a cause of action. However, because the March 2006 indemnity agreement issue has been extensively briefed on appeal and it is largely a legal issue, we find it appropriate to provide guidance to the court and parties on remand. Our discussion is

18

based on the record before us, and does not limit the parties' right to present additional relevant and admissible evidence in the proceedings below.

### 1. *Legal Principles*

In interpreting an indemnity agreement issued in the context of surety bonds, courts are governed by well-settled rules of contract interpretation. (*City of Chino v. Jackson* (2002) 97 Cal.App.4th 377, 382 (*City of Chino*); *Fidelity & Deposit Co. v. Whitson, supra*, 187 Cal.App.2d at p. 756.) The court's fundamental task is to determine the mutual intention of the parties at the time the contract was formed. " ' "Such intent is to be inferred, if possible, solely from the written provisions of the contract. [Citation.] The 'clear and explicit' meaning of these provisions, interpreted in their 'ordinary and popular sense,' unless 'used by the parties in a technical sense or a special meaning is given to them by usage' [citation], controls judicial interpretation. [Citation.]" ' [Citation.]" (*E.M.M.I. Inc. v. Zurich American Ins. Co.* (2004) 32 Cal.4th 465, 470.)

If the language is unambiguous, the court must enforce the plain meaning. (*Clarendon America Ins. Co. v. North American Capacity Ins. Co.* (2010) 186 Cal.App.4th 556, 566.) However, if contract language is susceptible to two or more reasonable interpretations, the court may admit extrinsic evidence to aid in interpreting the contract. (*Wolf v. Walt Disney Pictures & Television* (2008) 162 Cal.App.4th 1107, 1126 (*Wolf*); *City of Chino, supra*, 97 Cal.App.4th at pp. 383-384.) The court may also admit extrinsic evidence to assist in determining whether contract language is susceptible to more than one reasonable inference. (*Wolf, supra*, 162 Cal.App.4th at p. 1126.) When there is no material conflict in the extrinsic evidence, the trial court interprets the contract

19

as a matter of law.  (*Ibid.*)  An issue of fact arises only if the contractual language is reasonably susceptible to both parties' competing interpretations and there is a credibility contest in the extrinsic evidence.  (*Id.* at p. 1134.)  Further, if the extrinsic evidence or other construction rules do not clarify the ambiguity, the ambiguity may be construed against the party who prepared the contract.  (*Steller v. Sears, Roebuck & Co.* (2010) 189 Cal.App.4th 175, 183.)

## 2. *Analysis*

The March 2006 indemnity agreement broadly provides that the "Undersigned" (defined to mean Engineered Systems and the Howard parties) "*shall indemnify and keep indemnified* the Surety against any and all liability for losses and expenses of whatsoever kind or nature, including attorney fees and costs, by reason of having executed or procured the execution *of Bonds*, or by reason of the failure of the Principal or Indemnitors to perform or comply with the covenants and conditions of this Agreement." (Italics added.)  Reasonably read, this substantive provision applies to all bonds issued by the surety (including those that have been "*executed*") and does not limit the Bonds to only those bonds that will be issued in the future.  (Italics added.)  Although the indemnity agreement does not specifically define the word "Bonds," it does state that the Undersigned shall not only indemnify but shall also "*keep* [the Surety] indemnified . . . against any and all liability" by reason of the surety issuing a bond.  (Italics added.) Viewed in its entirety, a reasonable common sense meaning of the indemnity obligation provision in the March 2006 agreement supports that "Bonds" referred to in the

agreement are not limited to bonds issued in the future or bonds issued with respect to a particular project.

This interpretation is supported by several other portions of the agreement.

First, section 22 states: "The Undersigned agree that this instrument shall cover *any bonds* executed on behalf of any, without limitation, subsidiary, partnership, limited partnership, joint venture, corporation, or limited liability company of the principals, whether now existing or formed hereafter, and whether partially or wholly owned and controlled, as if the names of such subsidiaries, partnerships, limited partnerships, joint ventures, corporations or limited liability companies appeared herein as principals." (Italics added.) Although this provision is directed primarily at identifying the related parties that can be held liable under the indemnity agreement, the phrase "any bonds" has meaning and does not suggest any limitation to the timing of when the bonds were issued.

Second, section 17 contains a paragraph stating: "The Undersigned shall continue to be bound under this Agreement even though the Surety, with or without notice to or knowledge of the Undersigned, has accepted or released or may in the future accept or release, other agreements of indemnity or collateral, from the Undersigned or others, in connection with the execution of Bonds." Under this provision, defendants agreed they would be bound by the indemnity obligation, even if ICW had entered into *other* indemnity agreements with the parties.

Third, the March 2006 indemnity agreement's "consideration" provision states that the agreement has been reached "in consideration of the Surety delivering one or more executed Bonds to the Principal, or the renewal or extension of Bonds, *or refraining from*

21

*trying to cancel Bonds . . . .*"  (Italics added.)  Other preliminary clauses in the agreement

likewise describe the purpose of the agreement as including ICW's agreement to refrain

from "canceling" the Bonds.6  By referring to the indemnity agreement's consideration

and purpose as including an agreement not to cancel bonds, it is reasonable to infer the

parties contemplated that the definition of bonds would extend to bonds that had been

issued in the past.  Defendants' argument that the "bonds that might be cancelled"

language refers solely to future bonds is not a reasonable reading of these clauses.  We

also reject defendants' argument that the recital provisions in the agreement (see fn. 6,

*ante*) contain a conclusive definition of the word "Bonds."  There is no such definition

contained in these provisions.  In any event, the description of Bonds in the Whereas

clauses does not exclude existing bonds from the indemnity agreement.

 Additionally, the extrinsic evidence presented on this issue was essentially

undisputed and supports the interpretation that the March 2006 indemnity agreement was

intended to cover all bonds issued by ICW in favor of Engineered Systems.  Where "the

---

6 These provisions state:  "WHEREAS, the Principal . . . may desire, or be required, to provide a surety bond or bonds, undertakings, or guarantees, and may request Surety to execute or procure the execution of such bonds, or the Principal or one or more of the Indemnitors may request the Surety to renew, continue or substitute new Bonds with the same or different conditions (any one or more of which will be referred to as 'Bonds'); *or the Principal or one or more Indemnitors may request the Surety to refrain from canceling such bonds*; and [¶] WHEREAS, the Principal and Indemnitors understand that the Surety expressly requires the delivery of this Indemnity Agreement as part of the consideration for the execution, renewal or extension of Bonds, *or for refraining from canceling Bonds*; and [¶] WHEREAS, the Indemnitors have a substantial, material and beneficial interest in the Principal obtaining Bonds, *or in Bonds not being canceled*." (Italics added.)

extrinsic evidence points only one way, . . . the meaning of the language in question may be ascertained as a matter of law and may be reviewed by an appellate court de novo." (*Solis v. Kirkwood Resort Co.* (2001) 94 Cal.App.4th 354, 360.)

The undisputed evidence shows the parties had a long-term business relationship, and Engineered Systems and the Howards understood that under the 1996 indemnity agreement they were required to indemnify ICW for any payments made on claims arising from the bonds, including the Rainbow bond. When the parties signed the March 2006 indemnity agreement, they expressly agreed that this agreement would supersede all other indemnity agreements on the same subject. The March 2006 indemnity agreement does not contain any provision stating or suggesting that it does not apply to existing obligations owed by Engineered Systems to ICW, and there is nothing in the record showing ICW would have agreed to waive all of its rights under the Rainbow bond, for which it had more than $1 million in liability at stake. The Rainbow bond specifically provided that "the obligation of Surety . . . shall continue so long as any obligation of [Engineered Systems] remains."

Defendants rely primarily on Howard's declaration to establish a triable issue of fact on the meaning of the March 2006 indemnity agreement. However, there is nothing in this declaration showing the parties intended to extinguish defendants' liability for the Rainbow bond by executing the March 2006 indemnity agreement, or that they intended that only the Sierra Madre bonds were covered by the agreement. According to Howard, ICW representatives told him that the March 2006 agreement "specifically related" to the Sierra Madre project. This statement does not suggest the March 2006 agreement covers

23

*only* that project and that it did not cover any other bonds. Indeed, such an interpretation would be flatly inconsistent with the language of the March 2006 indemnity agreement, which refers to "Bonds" in the plural without limitation to the Sierra Madre bond. "[P]arol evidence is admissible only to prove a meaning to which the language is 'reasonably susceptible' [citation], not to flatly contradict the express terms of the agreement." (*Winet v. Price* (1992) 4 Cal.App.4th 1159, 1167; see Code Civ. Proc., § 1856, subd. (a); *Wolf, supra*, 162 Cal.App.4th at p. 1126.) Further, as explained below, the "fraud" exception to the parol evidence rule is inapplicable on the factual record before us.

Howard's other statement in his declaration that the *deed of trust* related "**only**" to the Sierra Madre project and that the deed of trust would be reconveyed after the completion of the project is also consistent with a conclusion that the March 2006 indemnity agreement applied to all Bonds, past and future. The record shows ICW sought additional collateral in the form of a deed of trust on the Howards' property because of the size and complexity of the Sierra Madre project and that this collateral was needed to secure Engineered Systems' performance on *this project.* But the parties' understanding that the deed of trust would relate only to a particular bond does not lead to a reasonable inference that the parties intended the March 2006 indemnity agreement would not cover all bonds. The fact the parties limited certain collateral to a particular bond does not mean they did not intend the general indemnity agreement to apply to all existing and future indebtedness.

24

Additionally, the undisputed evidence shows that several months after ICW was served with the Rainbow lawsuit, the Howards offered to provide ICW with a free defense. This response gives rise to the strong inference that — despite their current assertions — the Howards always understood and believed that Engineered Systems remained bound to indemnify ICW regarding payments made on the Rainbow bond. The parties' subsequent conduct is relevant to show the intended meaning of ambiguous contract language. (See *Southern Cal. Edison Co. v. Superior Court* (1995) 37 Cal.App.4th 839, 851; *Morey v. Vannucci* (1998) 64 Cal.App.4th 904, 912; see also *Wolf v. Superior Court* (2004) 114 Cal.App.4th 1343, 1356.)

Defendants' main appellate argument is that the March 2006 indemnity agreement applied only to the Sierra Madre bond. However, there is nothing in the language of the March 2006 indemnity agreement that supports *this* proposed interpretation. The March 2006 indemnity agreement does not refer to or mention the Sierra Madre bond. The fact that the indemnity agreement applies to "Bonds" generally is stated throughout the agreement without any express or implied limitation to a single bond.

Considering the language of the March 2006 indemnity agreement and the extrinsic evidence presented by the parties, the only plausible interpretation of the March 2006 indemnity agreement is that it encompassed defendants' promise to indemnify ICW for future and existing bonds, including the Rainbow bond.

Defendants rely on several cases to support their argument that the March 2006 indemnity agreement did not apply to the Rainbow bond. (See *Fischer v. First Internat. Bank* (2003) 109 Cal.App.4th 1433 (*Fischer*); *City of Chino, supra*, 97 Cal.App.4th 377;

25

*United States Fire Ins. Co. v. Johansen* (1969) 270 Cal.App.2d 824 (*Johansen*); *Bank of America etc. Assn. v. Kelsey* (1935) 6 Cal.App.2d 346, 350 (*Kelsey*).)

In *Johansen*, the court addressed a similar legal issue as presented here: whether an indemnity contract applied to earlier issued bonds. (*Johansen, supra*, 270 Cal.App.2d at pp. 827-828.) After examining the language of the contract *and* the circumstances surrounding the execution of the indemnity contract, the court concluded the agreement did not cover earlier issued bonds. (*Id.* at pp. 836-840.) However, the facts were materially distinguishable from here. Unlike here, the *Johansen* defendant did not have a preexisting obligation to reimburse the surety for the prior bonds, and the parties stipulated that the purpose of entering into the indemnity agreement was to provide indemnity for *future* bonds. (*Id.* at p. 838.) Additionally, the recitals in the *Johansen* indemnity agreement contained language referring only to future bond issuance; whereas in this case the recitals included the surety's promise to "refrain[ ] from canceling bonds." Further, in a related agreement executed several weeks earlier, the *Johansen* surety included a typewritten provision stating that " 'It is further understood and agreed that this Agreement of Indemnity, executed subsequent to the execution of certain bonds is nevertheless to be retroactive in all respects and applicable thereto.' " (*Id.* at p. 839, fn. 5.) The court found significant the absence of such provision in the agreement before it. (*Ibid.*) There is no similar evidence that in other agreements ICW included a specific reference to prior bonds.

*Kelsey, supra*, 6 Cal.App.2d 346 is also distinguishable. *Kelsey* stated that "all guarantees are prospective and not retrospective in operation, unless the contrary appears

26

by express words or by necessary implication." (*Id.* at p. 350.)  This principle is consistent with our conclusion in the case.  As explained, the contractual language and the circumstances surrounding the execution of the agreement show that the parties necessarily intended the agreement to cover the existing bonds.  By contrast, in *Kelsey*, there was no express or implied promise to pay prior indebtedness.

*Fischer* is also unhelpful to defendants' position.  In *Fischer*, this court interpreted a dragnet clause in a trust deed that was "filled with legal jargon that would have been incomprehensible to the average layperson." (*Fischer, supra*, 109 Cal.App.4th at p. 1446.)  Emphasizing the specific rules applicable to the interpretation of dragnet clauses (that often " ' "enwrap the unsuspecting debtor in the folds of indebtedness" ' "), we found the dragnet clause was ambiguous and that the evidence presented by the property owners supported their interpretation of the agreement. (*Id.* at pp. 1446, 1443-1450.)  The circumstances here are legally and factually dissimilar.

In *City of Chino*, the indemnity agreement contained a specific provision stating that it applies to bonds issued "whether before or after the date of this Agreement." (*City of Chino, supra*, 97 Cal.App.4th at p. 384.)  The court found this language unambiguously covered all bonds whether "executed before or after the indemnity agreement." (*Id.* at p. 385.)  However, the fact the March 2006 indemnity agreement did not contain this specific contractual language does not mean it must be interpreted to apply only to future bonds.  Each indemnity agreement must be viewed based on the particular language used in the instrument and, if ambiguous, the surrounding circumstances.

27

Defendants' reliance on the California Supreme Court's recent decision in

*Riverisland Cold Storage, Inc. v. Fresno-Madera Production Credit Assoc.* (2013) 55

Cal.4th 1169 (*Riverisland*) is misplaced.[7] In *Riverisland*, the California Supreme Court

reaffirmed the statutory exception to the parole evidence rule that allows a party to

present extrinsic evidence to show that a written agreement was procured by fraud, even

if the alleged misrepresentations were inconsistent with the subsequent language

contained in the written agreement. (*Id.* at pp. 1174-1183; see Code Civ. Proc., § 1856,

subd. (g).) In so doing, the *Riverisland* court overruled *Bank of America etc. Assn. v.*

*Pendergrass* (1935) 4 Cal.2d 258, which held that alleged misrepresentations to induce a

party's assent to the contract are inadmissible if the alleged misrepresentations are

inconsistent with the provisions of the written contract. The *Riverisland* court reasoned

that *Pendergrass* was not supported by the plain language of Code of Civil Procedure

section 1856 and *Pendergrass* "failed to account for the fundamental principle that fraud

undermines the essential validity of the parties' agreement." (*Riverisland, supra*, at p.

1182.) The *Riverisland* court stated: "When fraud is proven, it cannot be maintained that

the parties freely entered into an agreement reflecting a meeting of the minds." (*Ibid.*)

*Riverisland* is inapplicable here. Defendants did not proffer any facts showing

that ICW made any misrepresentations to the Howards with respect to the Rainbow bond

or fraudulently procured the parties' agreement to the March 2006 indemnity agreement

---

7    The *Riverisland* decision was filed the same day oral argument was held in this case. We subsequently gave the parties the opportunity to brief the impact of this case on the issues before us.

28

based on false promises that the indemnity agreement would not cover the Rainbow bond. Defendants did not assert any fraud claim (affirmatively or in defense of ICW's contract claim), nor did they present any facts showing that ICW made any false statements to them about the continuing force of their indemnity obligations with respect to the Rainbow bond. Specifically, there is no evidence in the appellate record showing that before the Howards signed the March 2006 agreement that ICW representatives said that the agreement did not cover the Rainbow bond or that the Howards would no longer be responsible for claims against ICW on the Rainbow project. As noted, the Howards' offer of a free defense to ICW in the Rainbow action makes quite clear that there was no such understanding by the Howards.

Finally, to the extent that the March 2006 indemnity agreement did not cover the Rainbow bond, the evidence is undisputed that the scope of the indemnity obligation was the same under the earlier 1996 agreement, which clearly did cover the Rainbow bond. In this respect, we find unavailing the Howards' reliance on the provision in the March 2006 indemnity agreement stating that: "This Agreement contains the entire agreement of the parties and supersedes any prior or contemporaneous written or oral agreements, representations and warranties between the parties *with respect to the subject matter* of this Agreement." (Italics added.) Defendants argue that this integration clause means that any liability under the 1996 indemnity agreement is eliminated because it is a "prior . . . written . . . agreement . . . between the parties" under this contract provision. This is true to the extent that the March 2006 agreement covers the Rainbow bonds because it would be an indemnity agreement "with respect to the subject matter of this

29

Agreement."  However, assuming the Howards' argument is correct and the March 2006 agreement was *not* intended to cover the Rainbow bond that *was* previously covered by the 1996 agreement, then the March 2006 agreement's integration provision does not apply to eliminate the Howards' prior indemnity obligations for the Rainbow bond because the 1996 indemnity contract covering the Rainbow bond would not be an agreement "with respect to the subject matter of this [March 2006] Agreement."  The Howards cannot have it both ways.  On the record before us, they are either liable under the March 2006 indemnity agreement for the Rainbow bond *or* they are liable under the 1996 indemnity agreement to indemnify ICW under the Rainbow bond.

### III. *Defendants' Cross-Complaint*

In the first cause of action of their cross-complaint, defendants sought declaratory relief pertaining to their contractual obligations under the March 2006 indemnity agreement.  Our conclusion that the court erred in granting summary judgment on ICW's breach of contract claim applies equally to this cause of action.

In the remaining causes of action in their cross-complaint, defendants alleged that ICW was liable for failing to reconvey the deed of trust on the Howards' personal residence.  Because ICW did not specifically address these claims in its moving papers or present supporting evidence, it did not meet its burden to show no triable issues of fact on these causes of action.  To the extent defendants are not continuing to pursue these claims, this can be clarified in the proceedings below.

Accordingly, we reverse the summary judgment in ICW's favor on the cross-complaint.

## DISPOSITION

Judgment reversed. Respondent to bear appellants' costs on appeal.


_____

HALLER, J.

WE CONCUR:


_____

NARES, Acting P. J.


_____

McINTYRE, J.